Kyle F. Reeder
Cannon Law Group
124 S 600 E
Salt Lake City, UT 84102
Telephone: 801-363-2999
kyle@cannonlawgroup.com

Benjamin Barr*
Barr & Klein PLLC
444 N. Michigan Ave., Ste. 1200
Chicago, IL 60611
Telephone: (202) 595-4671
ben@barrklein.com

Stephen R. Klein*
Barr & Klein PLLC
1629 K St. NW, Ste. 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@barrklein.com

*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs Are You Listening Yet PAC and Tracie Halvorsen*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ARE YOU LISTENING YET PAC, and TRACIE HALVORSEN,<br><br>          Plaintiffs,<br><br>v.<br><br>DEIDRE HENDERSON, Lieutenant Governor of the State of Utah, in her official capacity,<br><br>          Defendants. | **MOTION FOR EXPEDITED PRELIMINARY INJUNCTION AND BRIEFING SCHEDULE**<br><br><br>Case No. 2:24-cv-00104 |

Plaintiffs Are You Listening Yet PAC ("AYLY PAC") and Tracie Halvorsen respectfully request this Court order expedited briefing and hearing on this motion to enjoin the unconstitutional signature submission deadlines enforced by the Lieutenant Governor for initiative campaigns along with related unconstitutional laws and practices. As more fully set forth in Plaintiffs' Memorandum of Law, Plaintiffs seek a preliminary injunction ordering the Lieutenant Governor to not enforce the February 15, 2024 deadline to qualify initiatives to be placed on the

2024 general election ballot or the other filing deadlines. Just last year, the Eighth Circuit invalidated an early deadline to qualify an initiative for the general election ballot based on First Amendment concerns that was strikingly similar to Utah's final deadlines. *SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023). Early deadlines such as the February 15 and a 316-day deadline create blackout periods in which important initiative signature gathering may not occur and during a timeframe in which the public is most interested in these issues. Because of this, they reduce the "total quantum of speech on a public issue" causing First Amendment injuries. *Meyer v. Grant*, 486 U.S. 414, 424 (1988). Injuries specific to the electoral process also trigger particularly time-sensitive harm because denying ballot access is a time-specific injury because the election "will only be held once[.]" *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1259 (D. Utah 2017).

Along with Utah's peculiarly early deadlines to qualify initiatives for the general election ballot comes a host of other plainly unconstitutional election law provisions. These include facially unconstitutional provisions, like forbidding most forms of paid signature gathering or restricting the use of non-resident signature gatherers. *See, e.g.*, *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 383 (6th Cir. 2008); *Independence Institute v. Gessler*, 936 F.Supp.2d 1256, 1276 (D. Colo. 2013); *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008). These also include unconstitutional practices, like county clerks refusing to certify entire packets of signatures under the 30-day deadline and refusing to return them. The cumulative effect of these provisions and practices is to make qualifying an initiative for the Utah ballot nearly impossible. Because important First Amendment rights connect to the initiative process, relief is requested here to restore Plaintiffs' ability to associate, advocate, and continue their attempt to qualify their initiative for the 2024 general election. *See, e.g.*, *Meyer,* 486 U.S. at 423; *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006).

An expedited briefing and hearing schedule are necessary to preserve First Amendment rights that will be irreparably damaged by Utah's imposition of its unusually early deadlines to qualify initiatives for the general election ballot. By setting so early a deadline as February 15, Plaintiffs are left with a blackout period of eight months and twenty days in which they cannot qualify their initiative for the general election ballot. The 316-day deadline poses a similar harm, ending the Plaintiffs' effort on March 13. Plaintiffs are forced to do the sort of public campaigning required for initiative drives in the dead of winter, during Utah's coldest months, when people are not frequently out at parks or other public, outdoor places.  And the remainder of Utah's initiative restrictions ensure they are hobbled in their efforts to qualify their initiative for the general election ballot, all the while dampening speech about this important topic statewide.

The Lieutenant Governor will be served the same day this Court issues the summons in this matter. As soon as service is perfected, a Certificate of Service will be posted on the docket. Plaintiffs propose the following briefing schedule:

- Defendants file their response brief by February 13, 2024;

- Plaintiffs forgo their reply brief;

- Hearing to be set for February 14, 2024. Given that Plaintiffs' lead counsel is out-of-state, they are amenable to a telephonic or videoconference hearing at the convenience of this Court and opposing counsel.

Utah's unusually early deadline to qualify initiatives for the general election ballot along with related laws and practices damage Plaintiffs' First Amendment rights and necessitate immediate relief prior to February 15, 2024. Plaintiffs request that the following relief be granted:

1. Extend the deadline for submissions of Restore Utah's Flag signatures to July 8, 2024 (as Utah historically followed this deadline), excepting the requirements of § 20A-7-

105(5)(a)(i) and (5)(b) and declare the February 15 deadline as unconstitutional. Compl., Request for Relief ¶2.a.

2.  Enter a preliminary injunction against the rolling 30-day signature packet verification deadline and direct the Lieutenant Governor to order county clerks to accept valid signatures on packets submitted after 30 days of the first signature but before the final deadline. Utah Code § 20A-7-105(5)(a)(i), (5)(b). Declare the law unconstitutional and direct the Lieutenant Governor to order all county clerks to review packets rejected under the 30-day deadline and to accept any signatures that are otherwise valid. Compl., Request for Relief ¶2.b-c.

3.  Enter a preliminary injunction against the 316-day submission deadline under Utah Code § 20A-7-105(5)(a)(i) and § 20A-7-105(5)(b) and declare they are unconstitutional and order the Lieutenant Governor to order all county clerks to review packets submitted after the March 13, 2024 deadline imposed by the 316-day deadline Compl. ¶17, Request for Relief ¶2.d.

4.  Enter a preliminary injunction permitting AYLY PAC, Ms. Halvorsen and other sponsors of Restoring the Utah State Flag may add "if the individual's previous signature has not been rejected" following "or to knowingly sign the individual's name more than once for the same measure" in the warning at the bottom of each petition page that they print. Lieutenant Governor Henderson must order all county clerks to consider these pages valid to assess signatures. Compl. Request for Relief ¶2.e.

5.  Enter a preliminary injunction against the packet retrieval prohibition under Utah Code § 20A-7-105(10) as applied to packets that have been wholly rejected and declare this unconstitutional and order the Lieutenant Governor to order all county clerks to return

packets that are wholly rejected to the person who submitted the packet. Compl., Request for Relief ¶2.f.

6. Enter a preliminary injunction against the two-signature limit for initiative sheets detailed in Utah Code § 20A-7-203(3) and declare it unconstitutional and order the Lieutenant Governor to approve a signature page that can accommodate 10 signatures on or before March 1, 2024. Compl., Request for Relief ¶2.g.

7. Direct the Lieutenant Governor to order all county clerks to provide the names of rejected signatures publicly in the same manner as accepted signatures are disclosed under § 20A-7-105(6)(a)(ii)(B) or, at a minimum, provide rejected names to the signature collector who verified the packet. Compl., Request for Relief ¶2.h.

8. Enter a preliminary injunction against the state's prohibition on paying circulators per signature gathered. Utah Code § 20A-7-104(1), (2), (3). Compl., Request for Relief ¶2.i.

9. Enter a preliminary injunction against the state's residency requirement for signature gatherers. Utah Code § 20A-7-105(4)(a)(i). Compl., Request for Relief ¶2.j.

10. Enter a preliminary injunction against knowingly signing an initiative petition more than once under Utah Code § 20A-7-213(1)(b) as applied to signers whose previous signature has been rejected and declare this unconstitutional. Compl. Request for Relief ¶2.k.

Dated: February 8, 2024                    Respectfully submitted,

Kyle Reeder
Cannon Law Group
124 South 600 East
Salt Lake City, Utah 84102
(801) 363-2999
kyle@cannonlawgroup.com

Benjamin Barr*
BARR & KLEIN PLLC
444 N. Michigan Avenue Ste. 1200
Chicago, Illinois 60611
(202) 595-4671
ben@barrklein.com

Stephen R. Klein*
BARR & KLEIN PLLC
1629 K St NW Ste. 300
Washington, DC 20006
(202) 804-6676
steve@barrklein.com

*Pro hac vice admission to be filed.*

Kyle F. Reeder
Cannon Law Group
124 S 600 E
Salt Lake City, UT 84102
Telephone: 801-363-2999
kyle@cannonlawgroup.com

Benjamin Barr*
Barr & Klein PLLC
444 N. Michigan Ave., Ste. 1200
Chicago, IL 60611
Telephone: (202) 595-4671
ben@barrklein.com

Stephen R. Klein*
Barr & Klein PLLC
1629 K St. NW, Ste. 300
Washington, DC 20006
Telephone: (202) 804-6676
steve@barrklein.com

*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs Are You Listening Yet PAC and Tracie Halvorsen*

---

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| ARE YOU LISTENING YET PAC, and TRACIE HALVORSEN, <br><br>      Plaintiffs, <br><br> v. <br><br> DEIDRE HENDERSON, Lieutenant Governor of the State of Utah, in her official capacity, <br><br>      Defendants. | **MEMORANDUM IN SUPPORT OF MOTION FOR EXPEDITED PRELIMINARY INJUNCTION** <br><br> Case No. <u>2:24-cv-00104</u> |

## I.   INTRODUCTION

Across America, states have experimented with changes to their flags over the past couple of decades. Recently, Minnesota decided to replace its allegedly racist flag, only to lead others to criticize its new flag's design as being too much like Somalia's flag. Michelle Del Rey, *Minnesota replaced its 'racist' flag. The new one is facing its own outrage*, THE INDEPENDENT, Dec. 20, 2023, https://www.independent.co.uk/news/world/americas/minnesota-new-state-flag-reaction-

b2467510.html [https://perma.cc/KMU5-JQW2]. In Utah, Deseret News reported that the legislative change to the state flag was "one of the biggest displays of citizen involvement during the 2023 legislative session." Jay Evensen, *Opinion: New Utah flag poked the beehive of public passion in Utah's capitol*, DESERET NEWS, Mar. 2, 2023, https://www.deseret.com/opinion/2023/3/2/23622755/utah-new-state-flag-controversial [https://perma.cc/N8DJ-3TP8]. Critics referred to the new design as "woke" or "Marxist." *Id.* Clearly, flag designs spark public passion and debate as they are the very symbols of our shared values.

An important part of public debate is found in the initiative process where states permit such direct democracy. Where citizens are entrusted with taking positions on some of the day's most contentious issues, care must be taken to ensure their First Amendment freedoms remain protected. This is the case here, where AYLY PAC, Ms. Halvorsen and their fellow supporters are concerned that Utah's attempt to replace its flag represents the tearing down of respected history and societal norms. Compl. ¶10.  AYLY PAC and Ms. Halvorsen have begun to engage the Utah public about this issue and would like to restore the state flag through use of the initiative process. But Utah's ballot access laws for statewide initiatives have proven unworkable and unsupportable under the First Amendment. This dampens important public debate about this issue that should be occurring in the months leading up to the general election in November. Because Utah law makes effective initiative advocacy an impossibility and maintains a lengthy blackout period for signature gathering, injunctive relief should be granted so Utahns may engage in this worthwhile debate. Perhaps the new flag will stay. Perhaps the old flag will be restored. But one principle remains certain: debate about that issue may not be censored.

## II.    STATEMENT OF THE FACTS

Plaintiffs are civic-minded residents of Utah who care deeply about shared values in their community, especially as symbolized by the state flag. Compl. ¶¶9-10. Plaintiffs have successfully taken the initial steps required under Utah law to qualify their initiative to restore the Utah flag to its prior version for placement on the 2024 general ballot. *Id*. at ¶¶11-12. However, Utah recently amended its initiative deadlines, requiring that final petition deadlines occur in the dead of winter on February 15. *Id*. at ¶17. This leaves Utahans with few hospitable months in which to do the hard work of qualifying their initiative for the ballot in public places like parks and the parking lots of grocery stores. *Id.* at ¶12. It also leaves Utahans with a large blackout period—some eight months and twenty days—in which they cannot solicit signatures or engage in effective advocacy before the general election. Utah law further compounds these problems by eliminating most ways to pay signature gatherers, forbidding non-resident signature gatherers, and imposing a Kafkaesque system of signature review that makes effective initiative advocacy a nullity in the Beehive State.

Plaintiffs seek immediate redress for infringements of their rights to engage in association and advocacy under the First Amendment as well as their right to initiative under the Utah Constitution. Without this relief, Plaintiffs will be stymied by Utah's cumbersome initiative system that makes a mockery of political advocacy and denies grassroots groups a realistic chance at qualifying their initiatives for the general ballot.

## III.   ARGUMENT

The Utah Constitution confers a power of initiative to its citizens. UTAH CONST. art. VI, § 1. The First Amendment "undoubtedly protects" political speech related to initiative campaigns. *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006). While there is no federal constitutional right to place an initiative on the ballot, restrictions on the initiative process may burden First Amendment rights. As recognized in *Meyer v. Grant*,  when an initiative

fails to qualify for the ballot, it does not become the "focus of statewide discussion." 486 U.S. 414, 423 (1988). Restrictions on the initiative process thus may reduce the "total quantum of speech on a public issue." *Id.* Thus, ballot access provisions for statewide initiatives may inflict First Amendment injuries.

Ballot access restrictions place a severe burden on core political speech, which triggers strict scrutiny, when they "significantly inhibit the ability of initiative proponents to place initiatives on the ballot." *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012). The Tenth Circuit has similarly reasoned that "petition circulation . . . is core political speech, because it involves interactive communication concerning political change," and consequently, First Amendment protection for this activity is "at its zenith." *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002) (internal quotations and citations omitted). Because petition circulation is at the heart of the First Amendment, the Tenth Circuit ordinarily applies strict scrutiny in such cases. *Id.* at 124142.

Similarly, the Supreme Court embraces what has come to be known as the *Anderson-Burdick* standard for evaluating ballot access challenges. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (analyzing the "character and magnitude" of cumulative burdens created by state electoral schemes against protected First Amendment rights). These principles have been recognized by this Court. *See Garbett v. Herbert*, 458 F.Supp.3d 1328 (D. Utah 2020); *see also Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018).

As will be demonstrated, Utah maintains several initiative ballot access laws that are individually unconstitutional. Their cumulative effect is to make the process of placing initiatives on the ballot considerably difficult while seriously dampening public debate about important civic issues. This supports the entry of injunctive relief.

### A. Standards for Issuing a Preliminary Injunction

To obtain a preliminary injunction, a movant must show: (1) substantial likelihood of prevailing on the merits; (2) irreparable injury if the injunction is denied; (3) greater injury to the movant absent the injunction than that which the opposing party will suffer under the injunction; and, (4) lack of adverseness to the public interest. *Utah Licensed Bev. Ass'n v. Leavitt*, 256 F.3d 1061, 1065–66 (10th Cir. 2001). A state defendant has the burden of justifying the regulation even on a motion to enjoin enforcement. *Id.* at 1073. The Tenth Circuit further instructs that courts should treat alleged First Amendment harms gingerly given their fragile nature. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003).

There is understandable reluctancy for federal courts to disrupt election rules "on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). This reluctancy originates out of *Purcell v. Gonzalez*, 549 U.S. 1 (2006). In *Purcell*, the Court stayed an injunction issued but weeks away from an election due to concerns over voter confusion and election disruption. Lower courts following this principle have generally allowed injunctive relief when elections are more than four months away or when there is no risk of voter confusion. *See, e.g.*, *League of Women Voters of Florida, Inc. v. Florida Secretary of State*, 32 F.4th 1363 (11th Cir. 2022) (stay entered against injunction since election was less than four months away); *Common Cause Indiana v. Lawson*, 978 F.3d 1036 (7th Cir. 2020) (*Purcell* not applicable where no risk of voter confusion would arise); *Archer v. Griswold*, 638 F.Supp.3d 1246 (D. Colo. 2022) (*Purcell* applies when election is three weeks away); *Holland v. Williams*, 457 F.Supp.3d 979 (D. Colo. 2018) (*Purcell* does not apply when election is nearly five months away). Since Utah's election addressing the flag initiative in controversy would occur in November 2024—more than eight months away—*Purcell* should not limit the relief available.

Lower courts addressing inequities and constitutional infirmities in ballot access cases have seen fit to grant relief in a variety of instances. *See, e.g.*, *Garbett v. v. Herbert*, 458 F.Supp.3d 1328 (D. Utah 2020) (deadline extended by one month); *Fair Maps Nevada v. Cegavske*, 463 F.Supp.3d 1123 (D. Nev. 2020) (deadline extended by six weeks); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997) (extending deadline for signature gathering for alternative party candidates from April to July); *Cromer v. State of South Carolina*, 917 F.2d 819 (4th Cir. 1990) (requirement to qualify as candidate for general election seven months prior deemed invalid and post-deadline signatures allowed); *Libertarian Party of Kentucky v. Ehrler*, 776 F.Supp. 1200 (E.D. Ky. 1991) (enjoining early deadlines). Where plaintiffs plead recognizable First Amendment injuries due to the existence of unconstitutional election law provisions, injunctive relief is the norm.

**B.  Plaintiffs are Likely to Succeed on the Merits of Their Claims**

**1.  Utah's Initiative Rules and Practices Make Qualifying Statewide Initiatives for the General Election Ballot Nearly Impossible and Infringe on Plaintiffs' First Amendment Rights and Right to Initiative Under the Utah Constitution**

Utah sets three different deadlines for the submission of signature packets needed to qualify statewide initiatives for the ballot, the latest of which is nearly nine months before the statewide election. Initiative petition drives must abide by additional rolling, 30-day deadlines to submit packets. Utah Code § 20A-7-105(5)(a)(i), (5)(b). That is, signed and verified signature packets must be submitted to the county clerk 30 days after the first signature obtained in a particular packet. *Id*. Otherwise, not a single signature will not be accepted by the state from that packet. Utah also bans all initiative petitioning from February 15 until November 4; the law includes a cut-off date of February 15 before the next general election in which to submit final signature packets for initiative petitions. Utah Code § 20A-7-105(5)(a)(i)(C). In other words, Utah censors

petitioning for eight months and twenty days before an election when Utahns would most be interested in initiative issues.

This case parallels the Eighth Circuit's recent holding in *SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023). There, a ballot committee challenged South Dakota's one-year filing deadline for ballot petition initiatives under the First Amendment. Recognizing that associating and advocating about initiatives as well as signing initiative petitions is "core political speech," the Eighth Circuit applied strict scrutiny. *Id.* at 1078 (quoting *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 128 (2011)). The Eighth Circuit understood that such a drastic limit on the timeframe in which one can petition was a heavy burden on First Amendment rights. By fashioning a year-long speech blackout before an election, South Dakota hampered the ability to gather signatures in a time when the electorate cares most about political issues and diluted the effectiveness of ballot committee's speech. *Id.* That is, smart initiative organizers elect to wait until there is timeliness to the proposal of an initiative. They speak out about their issue in close proximity to an election. By cutting off so large a timeframe in which to associate, speak, and petition, the South Dakota law was sure to make "it less likely that [SD Voice] will garner the number of signatures necessary to place [a] matter on the ballot, thus limiting [its] ability to make [its political causes] the focus of statewide discussion." *Id.* (quoting *Meyer*, 486 U.S. at 423). Because of this, the Eighth Circuit invalidated the year-prior filing requirement.[1]

Importantly, South Dakota previously administered a system where the filing deadline was in April instead of November of the previous year. Utah's initiative deadlines have also extended considerably backwards, to longer and longer before an election. In the 1990s, initiative packets

---

[1] This holding is consistent with that of campaign finance caselaw invalidating blackout periods in which organizations might speak and affect political change. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 337–38 (2010).

were due "no later than 120 days before any general election[.]" *See, e.g.*, Utah Code § 20A-7-206 (1995). Today, this deadline would be July 8. This was then extended back to "June 1 before the regular general election" at the turn of the century. *See, e.g.*, Utah Code § 20A-7-206 (2000). In 2008, the deadline was pushed back further still to "April 15 before the regular general election." *See, e.g.*, Utah Code § 20A-7-206 (2009). Only in 2020 was the present and latest deadline of February 15 implemented. *See, e.g.*, Utah Code § 20A-7-206 (2021).[2]

Yet, though the deadlines moved further back, the law typically gave county clerks around one month to complete their verification process. *See, e.g.*, Utah Code § 20A-7-206 (2004) (providing June 1 as deadline for initiative packet submission and July 1 deadline for county clerks to certify and deliver packets to lieutenant governor); Utah Code § 20A-7-206 (2008) (providing for April 15 as deadline for initiative packet submission and May 15 as deadline for county clerks to certify and deliver packets to lieutenant governor); Utah Code § 20A-7-206 (2018) (providing for same certification deadlines as in 2008). Moreover, Utah election law has traditionally required the Lieutenant Governor to act immediately to certify the sufficiency of the petition with varying deadlines to do so. Utah Code § 20A-07-207 (2004) (July 6 deadline); Utah Code § 20A-07-207 (2008) (June 1 deadline); Utah Code § 20A-07-207 (2018) (June 1 deadline). These do not suggest a need to move the deadlines back from the election; quite the contrary.

In the early 2000's, caselaw indicates that Utah successfully managed its June initiative deadlines—some five months before an election. *See Gallivan v. Walker*, 54 P.3d 1069, 1077 (Utah 2002). Even with less advanced technology than we have today, the state was able to administer final certification of initiatives in the summer before a general election. Doing so ensured that

---

[2] The 30-day rolling deadline was also added in 2020, while the 316-day aggregate deadline was added in 2011. 2020 Utah Laws Ch. 349 (S.B. 47); 2011 Utah Laws Ch. 17 (S.B. 165).

enough of a timeframe existed for both the state to protect against fraud and for initiative petitioners to have enough time to engage in public advocacy. In terms of administrative burden, the common timeframe needed for the Utah county clerks to verify packets for signer resident status and signature validity has been one month. Under current law, initiative proponents must turn their final initiatives in by February 15 and the Lieutenant Governor has until April 30 to declare the packets sufficient or insufficient. Utah Code § 20A-7-207(3). With today's advanced technology easing administrative burdens, deadlines to certify initiatives to qualify for the 2024 general election ballot can be considerably extended. They certainly cannot be compressed without a compelling reason.

Utah's law fares no better than South Dakota's and suffers further constitutional infirmities. Triggering a 30-day deadline for a packet after the first signer signs a petition serves no purposes but to compound the costs that sponsors are already bearing to print the packets in the first place. This places unneeded pressure and time constraints on signature gatherers to complete a packet within 30 days or to waste resources by submitting partial packets to the state. The other deadlines, the earlier of 316 days after the application is filed or February 15 are no less baseless and are unreasonably restrictive. Like *SD Voices*, AYLY PAC and Ms. Halvorsen need time to share their advocacy with the Utah public—not in the dead of winter during Utah's coldest days, but come spring once more Utahns are accessible in public places like grocery marts, parks, and shopping malls. As was recognized in *Meyer*, artificial cut-off dates like this "limit[] the number of voices who will convey [the proposed] message" during an important timeframe—eight months and twenty days before an election. 486 U.S. at 423. And history demonstrates that Utah can complete the important tasks of verifying the validity of initiatives while allowing a much longer timeline for initiative proponents to qualify their initiative for the ballot.

As AYLY PAC has attested, its early signature gathering efforts are developing and growing and its best chances for interacting with the Utah public must begin in the spring to have success. Compl. ¶¶ 12, 22. Utah's artificial cut-off date for submitting signature packets limits severely the number of voices able to carry Restoring the Utah State Flag message and to effectuate change in the state. Utah effectively bans all petition gathering for eight months and twenty days before an election during a time when petition drives would be most salient to the public. *SD Voice*, 60 F.4th at 1078. Utah's ban is approximately seventy percent as long as the ban invalidated in *SD Voice*. Like South Dakota, Utah has a history of being able to administer initiative deadlines ranging from February 15 to July 8 before a general election. While it enjoys limited authority to police for fraud in the electoral process, it cannot do so by effectuating a lengthy ban on signature gathering during the most effective time windows of the year—when the electorate is listening and when advocates such as Ms. Halvorsen desire to associate and speak. This might be more convenient and easier for Utah to administer, but protecting Plaintiffs' First Amendment rights justifies minor inconveniences.

Utah's initiative laws, and their application, get even worse. For those brave enough to engage in signature gathering, Utah limits signatures to but two per page under Section 20A-7-203(3) for initiative petitions. Curiously, independent candidates may include up to ten signatures per page on a signature packet. Utah Code § 20A-9-502(1)(b). Nothing can explain this differential treatment of signature allotments other than blatant discrimination against the initiative process. Efforts to impose additional costs and burdens on the initiative process are recognized First Amendment infirmities. *See, e.g.*, *Independence Institute v. Gessler*, 936 F.Supp.2d 1256, 1276 (D.

Colo. 2013); *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 383 (6th Cir. 2008).[3] By limiting initiative petitions to two signatures, Utah imposes five times the printing cost burden compared to independent candidates and necessarily limits the "total quantum of speech on a public issue" by making it more expensive and burdensome for one class of speakers to speak. *Meyer*, 486 U.S. at 423.

AYLY PAC and others working on Restoring the Utah State Flag have encountered certain infirmities in the verification process, too. County clerks and their staff reject entire packets of signatures based on the 30-day deadline under § 20A-7-105(5)(b), refuse to return those packets under § 20A-7-105(10), and make no effort to identify the names rejected within said packet. Compl. ¶¶18-19, 25. After all, the law only requires disclosing certified names under Section 20A-7-105(6)(a)(ii)(B). This is the case with accepted and rejected packets alike, and even with accepted packets, this leaves the Plaintiffs and other supporters to cross-reference the number of rejected signatures in a given packet with the Lieutenant Governor's certified names website to try and figure out who was rejected. Because there is no readily apparent cure process for this, signatures are invalidated and Plaintiffs' advocacy becomes futile.[4]

If that is not Kafkaesque enough, currently it would not even matter if the state did disclose rejected signers, because Utahns are unequivocally barred under threat of misdemeanor from knowingly signing the same initiative twice, whether their name has been certified or not. Utah Code § 20A-7-213(1)(b). As of February 7, a total of 7,750 signers have been rejected because

---

[3] Similar burdens are recognized as unconstitutional in the campaign finance context, such as state-mandated disclosures that make political printing and advertising more expensive. *Yes on Prop. B v. City and County of San Francisco*, 440 F.Supp.3d 1049, 1055 (N.D. Cal. 2020).

[4] As is detailed in the complaint, several county clerks offices have invalidated entire signature packets for unknown reasons while offering no readily apparent cure process. *See* Compl. ¶19.

they are not registered to vote. Compl., Exh. B. This should be easy to remedy: Ms. Halvorsen could contact them, they could renew their voter registration, and sign again. But if they did that, aiding and abetting the right to initiative is a crime, too. *See* Utah Code § 76-2-202. This is not about deterring fraud or ensuring efficiency: it is about deterring the right to initiative and free speech unequivocally. Utah's failure to include readily accessible and easy-to-use cure provisions for its initiative process all burden the First Amendment rights of Plaintiffs.

This Court enjoys discretion to decide issues of state constitutional concern under its pendent jurisdiction authority. *Bauchman for Bauchman v. West High School*, 132 F.3d 542, 549 (10th Cir. 1997). Considerations of judicial economy, convenience, and fairness to the litigants are determinative in making this decision. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Because AYLY PAC is a grassroots organization with grassroots funding, it was required to select one court in which to litigate its claims. Because the claims depend on the same facts and same actors, it preserves judicial resources to have them heard in one forum. Thus, Plaintiffs advance their state constitutional law claims here, specifically the right to initiative under the Utah Constitution.

While the legislature may enact laws that govern "the conditions . . . the manner, and . . . the time" that citizens engage in initiatives, the Utah Supreme Court has recognized that "any restriction . . . on its own, or in connection with other requirements, rise[s] to the level of being an undue burden if legislative requirements vis-à-vis the number, manner, condition, or time are unreasonably restrictive." *Cook*, 2014 UT 46, ¶ 18 (Utah 2014). The legislature may enact laws for the purposes of "'deterring fraud, ensuring the efficiency of the process, [and] ensuring a modicum of numerical support for an initiative.' . . . 'The legislature may not, however, impose discriminatory restrictions on the initiative right . . . simply for the sake of making it harder to

[place an initiative on the ballot] and restricting the initiative power.'" *Id.* ¶25 (quoting *Gallivan v. Walker*, 2002 UT 89, ¶ 53). For the reasons previously described supporting their federal claims, Plaintiffs allege that the same burdens unduly infringe their right to initiative under the Utah Constitution.

Whether viewed through the lens of the First Amendment or the Utah Constitution, Utah's promise of a real initiative process is but an illusion. With its blackout period of eight months and twenty days, serious judicial attention is required to save fragile constitutional liberties before this Court.

### 2.   Utah's Ban of Most Paid and all Non-Resident Signature Gatherers is Facially Unconstitutional

Utah law includes a prohibition on paying circulators per signature gathered. Utah Code § 20A-7-104(1), (2), (3). As has been recognized by other federal courts, prohibitions on paying circulators per signature makes "proposing and qualifying initiatives more expensive" and "prevents proponents from using individuals who would most effectively convey their message to the public . . . ." *Deters*, 518 F.3d at 383; *Gessler*, 936 F.Supp.2d at 1276. Such an effort only contravenes *Meyer*'s rule that the "First Amendment protects [a speaker's] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." 486 U.S. at 424.

To date, AYLY PAC has relied primarily on volunteer efforts to engage in initiative signature efforts. *See* Compl. at ¶¶22-23.  However, it would like to use paid circulators in the spring once temperatures in Utah are more hospitable so it can amplify its message and effectiveness. *Id.* at ¶23. Plaintiffs wish to use a blend of volunteer signature gatherers (now) along with paid gatherers once the weather becomes better. *Id.* at ¶¶15, 21, 23.

Utah also prohibits non-resident signature gatherers to associate with AYLY PAC and engage in effective advocacy about Restoring the Utah State Flag. Utah Code § 20A-7-105(4)(a)(i). This prohibition is plainly precluded per the Tenth Circuit's holding in *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008). There, like Utah, Oklahoma banned all non-residents from being petition circulators. However, the appellant needed to rely on non-resident signature gatherers because firms were largely located outside of Oklahoma and out-of-state firms were more professional. *Id.* at 1026. Thus, using non-resident signature gatherers made their advocacy more efficient and increased the likelihood that their initiative would qualify for the ballot.

Because petition circulation involves "interactive communication concerning political change[,]" the Tenth Circuit applied strict scrutiny. *Id.* at 1028. However, Oklahoma could not sufficiently explain why it needed to ban all non-residents from engaging in signature gathering even when evidence of potentially fraudulent activity was before the court. *Id.* at 1029. In particular, Oklahoma could have used a number of less-restrictive means to protect against fraud as an alternative to a ban, thus protecting First Amendment freedoms. *Id.* at 1030–31.

Utah is the 20th least populated state in the union. *See* World Population Review, US States Ranked by Population 2024, available at: https://worldpopulationreview.com/states. Its neighbor to the south, Arizona, features more than twice its population. *Id.* Its neighbor to the east, Colorado, is similarly situated with almost twice its population. *Id.* But initiative proponents are not allowed to use signature gatherers, paid or otherwise, from these nearby, more populated states, to make their advocacy effective and to increase their chances of qualifying their initiative for the ballot. AYLY PAC has a small pool of signature gatherers from nearby states who are nonresidents willing to assist them in their petition circulation. Compl. ¶23. All that stops them from effective

14

association and advocacy is Utah law. Like the Tenth Circuit has already observed, there is no particular reason to believe that signature gatherers from Colorado, Arizona, or anywhere outside of Utah are somehow "more likely to engage in fraud than resident circulators." *Savage*, 550 F.3d at 1209. And even if Utah harbors such fears, a ban is not the way to protect against electoral fraud due to the damage it inflicts on honest, First Amendment protected petition circulation.

Utah's electoral scheme suffers from the same constitutional infirmities as *Deters*, *Gessler*, and *Savage*. Utah's provisions found in Utah Code §§ 20A-7-104(1), (2), (3) and 20A-7-105(4)(a)(i) are particularly suited for facial invalidation given prior rulings against similar schemes. Because the challenged scheme involves petition circulation protected "at the zenith" of the First Amendment, strict scrutiny should apply. *Id.* at 1028–29. Instead of allowing for a free market in signature gatherers, Utah commands how initiative drive proponents must pay signature gatherers and dictates where these signature gatherers must reside. This command-and-control approach eliminates the most effective means for Plaintiffs to associate and to share their views about the Utah flag with the public and qualify their initiative for the ballot. The law forces Plaintiffs to avoid commonly used per-signature and fixed-price signature gathering services. By removing the most effective way citizens have to spread their message about an initiative proposal, Utah has shut down effective advocacy. In doing so, it has significantly inhibited the ability of AYLY PAC and Ms. Halvorsen to associate with others and effectively advocate for their cause while damaging its ability to put Restore Utah's Flag on the ballot, necessitating relief.

### 3. The Cumulative Effect of Utah's Cumbersome Law is to Silence Public Debate, Association, and Petitioning About Important Civic Issues While Injuring Plaintiffs' Ability to Qualify Initiatives for the Ballot

Each of the previously described constitutional infirmities are sufficient individually to afford relief in this challenge. But constitutional precedent affirms the cumulative effect of election

law provisions should be weighed when deciding on whether to grant relief and to what degree. *See, e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 34 (1968); *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014). This Court has followed this very approach in candidate ballot access cases. *Garbett*, 458 F.Supp.3d at 1344 (measuring "character and magnitude" of injury at hand). The coalescing effect of Utah's initiative ballot access laws makes a mockery of the First Amendment and the right to initiative under the Utah Constitution.

Utah has amended its initiative ballot access laws to keep what it considers pesky initiatives away from the prying eyes of the voting public. But Utah lacks any such power to prevent speakers from using the most economical means to convey their messages, to stop speakers from having an adequate timeframe in which to associate, debate, and gather signatures about their proposed initiative, and to face a Kafkaesque system that denies signatures and verification without ever letting one cure supposed defects. This is not a system of initiative that Utah has created, but of faux-initiative. Few, if any, initiative drives would succeed under these rules and practices. Because of the cumulative effect of this, the "total quantum of speech" about Utah's flag will be severely restricted. *Meyer*, 486 U.S. at 423. Utah is not free to limit important public debate about these issues, necessitating that relief is appropriate here.

### C.  Without Relief, Plaintiffs will Suffer Irreparable Harm

After concluding that Plaintiffs have a likelihood of success on the merits of their First and Fourteenth Amendment claims, they are "entitled to a presumption of irreparable injury." *Garbett*, 458 F.Supp.3d at 1250. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Injuries specific to the electoral process also trigger irreparable harm because denying ballot access is a particularly time-specific injury as the election "will only be held once[.]" *United Utah Party v.*

*Cox*, 268 F. Supp. 3d 1227, 1259 (D. Utah 2017); *see also Citizens United*, 558 U.S. at 334 ("Today, Citizens United finally learns, two years after the fact, whether it could have spoken during the 2008 Presidential primary—long after the opportunity to persuade primary voters has passed"). This is only compounded by the fact that Utah law only permits the same initiative to run once every four years. Utah Code § 20A-7-202(5)(a)(v). The effort to restore Utah's flag is specific to the upcoming election and Plaintiffs' window of opportunity is now—not an election four years in the future. Irreparable harm has been met and should be addressed here.

### D.  Injunctive Relief Restoring First Amendment Rights is in the Public Interest

It is "always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012) (internal quotation marks and citation omitted). Granting an injunction here would restore First Amendment rights in line with holdings from the Supreme Court and Tenth Circuit. Namely, it will vindicate Plaintiffs' First Amendment rights of association and advocacy in the form of initiative petitioning. This causes no harm to the state, as the general election is approximately nine months away and Utah has verified initiatives up to the month of July in past years. Because the vindication of "First Amendment freedoms is clearly in the public interest" and the relief requested is squarely supported by existing First Amendment jurisprudence, this tips in Plaintiffs' favor. *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005).

## IV.   RELIEF REQUESTED

Plaintiffs respectfully request the relief detailed in their motion for preliminary injunctive relief.

## V.    CONCLUSION

Utah has amended its election law to enact a peculiarly short deadline for citizens to qualify their initiatives for the general election ballot. It has also encumbered the initiative process with additional hurdles and difficulties, ensuring most will fail to qualify their initiative drives with the state. With these policies and practices come constitutional consequences. Utah is without the power to reduce the "total quantum of speech on a public issue" and thus violates the First Amendment through its cumbersome initiative process. *Meyer*, 486 U.S. at 423. Because of this, immediate relief should be awarded to restore Plaintiff's First Amendment rights.

Respectfully submitted,

Kyle Reeder
Cannon Law Group
124 South 600 East
Salt Lake City, Utah 84102
(801) 363-2999
kyle@cannonlawgroup.com

Benjamin Barr*
BARR & KLEIN PLLC
444 N. Michigan Avenue Ste. 1200
Chicago, Illinois 60611
(202) 595-4671
ben@barrklein.com

Stephen R. Klein*
BARR & KLEIN PLLC
1629 K St NW Ste. 300
Washington, DC 20006
(202) 804-6676
steve@barrklein.com

*admission pro hac vice pending*

18

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th of February, 2024, the foregoing motion for expedited preliminary injunctive relief and supporting memorandum was served upon the Lieutenant Governor's office by hand delivery.

I further certify that, pursuant to Federal Rule of Civil Procedure 5(b)(2)(C), all other Defendants will be served a copy of this appearance by first class mail.

/s/

*Counsel to Plaintiffs*