SCOTT CHENEY (6198)
DAVID N. WOLF (6688)
LANCE F. SORENSON (10684)
JASON DUPREE (17509)
Assistant Utah Attorneys General
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100

*Counsel for Defendant Lt. Governor Henderson*

---

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| ARE YOU LISTENING YET PAC, and TRACIE HALVORSEN, | **DEFENDANT LIEUTENANT GOVERNOR HENDERSON'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| *Plaintiffs,* | |
| v. | Case No. 2:24-CV-00104 |
| DEIDRE HENDERSON, in her official capacity as Lieutenant Governor of the State of Utah, | Judge Jill Parrish |
| *Defendant.* | |

# Table of Contents

INTRODUCTION ....................................................................................................................1

DEFENDANT'S STATEMENT OF FACTS ........................................................................3

STANDARD OF REVIEW .....................................................................................................12

ARGUMENT .............................................................................................................................13

    I.      PLAINTIFFS' CLAIMS OF IRREPARABLE HARM (AS WELL AS THEIR CLAIMS ON THE MERITS) ARE BARRED BY LACHES ..............................................................................................13

    II.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS ................................................15

        A.  Standard of Review ..........................................................................................15

        B.  Plaintiffs are not likely to succeed on the merits of any of their claims because those claims are barred by laches ........................................................................18

        C.  Plaintiffs are not likely to succeed on the merits of their claims alleging that the deadlines are unconstitutional ....................................................................18

        D.  Plaintiffs are not likely to succeed on the merits of their claim that the circulator payment restrictions are unconstitutional ...................................................22

        E.  Plaintiffs are not likely to succeed on the merits of their claim that a residency requirement is unconstitutional .......................................................................25

        F.  Plaintiffs are not likely to succeed on the merits of their claim that the packet retrieval prohibition is unconstitutional ..........................................................27

        G.  Plaintiffs are not likely to succeed on their claims that the formatting of the signature pages is unconstitutional .................................................................28

        H.  Plaintiffs are not likely to succeed on the merits of their claim that the prohibition on signing an initiative petition more than once is unconstitutional .......................28

        I.  Plaintiffs are not likely to succeed on the merits of their claim that the warning against criminal behavior on the signature page is unconstitutional .................29

        J.  The provisions of which Plaintiffs complain do not violate the Utah Constitution ........29

    III.    THE PUBLIC INTEREST WOULD BE HARMED BY GRANTING THE MOTION FOR PRELIMINARY INJUNCTION ...........................................................................................29

    IV.   BALANCING OF THE HARMS ....................................................................................30

CONCLUSION .........................................................................................................................30

# Table of Authorities

**Page(s)**

**Cases**

*American Humanist Association, Inc. v. Douglas County School District RE-1,*
859 F.3d 1243 (10th Cir. 2017)..................................................................25

*American Party v. White,*
415 U.S. 767 (1974).................................................................................21

*Anderson v. Celebrezze,*
460 U.S. 780 (1983).................................................................................17

*Archer v. Griswold,*
638 F. Supp. 3d 1246 (D. Colorado 2022)..........................................passim

*Arizonans for Official English v. Arizona,*
520 U.S. 43 (1997)...................................................................................25

*Biodiversity Conservation All. V. Jiron,*
762 F. 3d 1036 (10th Cir. 2014) ..............................................................12

*Buckley v. American Constitutional Law Foundation, Inc.,*
525 U.S. 182 (1999)....................................................................1, 15, 17

*Burdick v. Takushi,*
504 U.S. 428 (1992).....................................................................16, 17, 18

*Camfield v. City of Oklahoma City,*
248 F.3d...................................................................................................26

*Campbell-Ewald Co. v. Gomez,*
136 S. Ct. 663 (2016)...............................................................................26

*Citizens for Tax Reform v. Deters,*
518 F.3d 375 (6th Cir. 2008)....................................................................25

*Costello v. United States,*
365 U.S. 265 (1961).................................................................................13

*Count My Vote, Inc. v. Cox,*
2019 UT 60, 452 P.3d 1109 ....................................................................18

*Democratic Nat'l Comm. v. Wis. State,*
Legis., 141 S. Ct. 28 (2020)....................................................................14

*Ducan v. Husted,*
125 F. Supp. 3d 674 (S.D. Ohio 2015) ...................................................20

*First National Bank of Boston v. Bellotti,*
435 U.S. 765 (1978).................................................................................24

*Fish v. Schwab,*
957 F.3d 1105 (10th Cir. 2020)................................................................17

*Fletcher v. United States,*
116 F.3d 1315 (10th Cir. 1997)................................................................27

*Fulani v. Hogsett,*
917 F.2d 1028 (7th Cir. 1990)..................................................................13

*Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne,*
698 F.3d 1295 (10th Cir. 2012).................................................................13

*Heideman v. South Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ...........................................................................12

*Initiative & Referendum Inst. v. Jaeger,*
  241 F.3d 614 (8th Cir. 2001) ...............................................................................23

*Jenness v. Fortson,*
  403 U.S. 431 (1971) ............................................................................................19

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) ................................................................................1, 16, 17

*Jordan v. Sosa,*
  654 F.3d 1012 (10th Cir. 2011) .....................................................................26, 27

*Kan. Health Care Ass'n. v. Kan. Dep't of Soc. & Rehab. Servs.,*
  31 F. 3d 1536 (10th Cir. 1994) ...........................................................................14

*Little v. Reclaim Idaho,*
  140 S. Ct. 2616 (2020) ...............................................................................1, 15, 16

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ............................................................................................12

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................................30

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
  389 F.3d 973 (10th Cir. 2004) ...........................................................................12

*Perry v. Judd,*
  471 F. App'x 219 (4th Cir. 2012) ......................................................................13

*Person v. New York State Bd of Elections,*
  467 F.3d 141 (2d Cir. 2006) ...............................................................................24

*Petrella v. Brownback,*
  787 F.3d 1242 (10th Cir. 2015) ...........................................................................15

*Pierce v. Jacobsen,*
  44 F.4th 853 (9th Cir. 2022) .......................................................................23, 24, 25

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ................................................................................................14

*Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd.,*
  844 F. 2d 740 (10th Cir. 1988) ...........................................................................21

*Rio Grande Silvery Minnow v. Bureau of Reclamation,*
  601 F.3d 1096 (10th Cir. 2010) ...........................................................................26

*Save Palisade Fruitlands v. Todd,*
  279 F.3d 1204 (10th Cir. 2002) ...........................................................................15

*SD Voice v. Noem,*
  60 F. 4th 1071 (8th Cir. 2023) ...........................................................................21

*Storer v. Brown,*
  415 U.S. 724 (1974) ...............................................................................1, 8, 9, 18

*Timmons v. Twin Cities Area New Party,*
  520 U.S. 351 (1997) ............................................................................................16

*United States v. Juvenile Male,*
  564 U.S. 932 (2011) .......................................................................................25, 26

*Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State,*
  2004 UT 32 ..........................................................................................................18

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................................12

Statutes

28 U.S.C. § 1367(c) ...................................................................................................17
52 U.S.C. § 20301 ......................................................................................................18
UTAH CODE § 20A-7-101 ............................................................................................1
UTAH CODE § 20A-7-301(1) ........................................................................................4
UTAH CODE § 20A-7-105(5)(ii) ....................................................................................4
UTAH CODE § 20A-7-307(3) .....................................................................................4, 5
UTAH CODE § 20A-7-105(5)(a)(i)(A) ...........................................................................5
UTAH CODE § 20A-7-105(5)(a)(i)(C) ...........................................................................5
UTAH CODE § 20A-7-105(6) ........................................................................................6
UTAH CODE § 20A-7-302(1) ........................................................................................6
UTAH CODE § 20A-7-105(5)(a)(ii)(B) ..........................................................................6
UTAH CODE § 20A-7-201(2)(a)(i) .................................................................................7
UTAH CODE § 20A-7-201(2)(a)(ii) ................................................................................8
UTAH CODE § 20A-7-105(5) .....................................................................8, 19, 21, 22
UTAH CODE § 20A-7-105(4)(a)(i) ...............................................................................10
UTAH CODE § 20A-7-105(10) ...............................................................................10, 27
UTAH CODE § 20A-7-203(3) ...............................................................................11, 28
UTAH CODE § 20A-7-213(1)(b) .............................................................................11, 28
UTAH CODE § 20A-7-203(3)(f)(iv) .......................................................................11, 29
UTAH CODE § 20A-7-104(1) ......................................................................................22
UTAH CODE § 20A-7-104(1)-(3) ...................................................................................9
UTAH CODE § 20A-9-408(9)(c) ....................................................................................6
UTAH CODE § 20A-9-403(3) ........................................................................................7
UTAH CODE § 63G-1-501 ............................................................................................3
UTAH CODE § 63G-1-503(1) ........................................................................................4
UTAH CODE § 63G-1-503(3) ........................................................................................4
UTAH CODE § 67-1a-2(2) .............................................................................................7
UTAH CODE § 20A-7-10 ...............................................................................................6
UTAH CONST. art. VI, §1 ..............................................................................................1
UTAH CONST. art. VI, § 2(a)(i) .....................................................................................1

Other Authorities

13C Wright, Miller & Cooper, § 3533.6, at 277 .........................................................26
S.B. 31 .....................................................................................................................3, 4
S.B. 107 .....................................................................................................................10

## INTRODUCTION

Utah's Constitution provides that the "Legislative power of the State shall be vested in: (a) a Senate and House of Representatives . . . and (b) the people of the State of Utah as provided [herein]."[1] The state Constitution expressly directs the Legislature to set by statute the "manner" and "conditions" by which initiatives are brought before the people.[2] "As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The regulation of elections includes the regulation of the manner in which initiatives are presented to the people.

Direct democracy measures such as the initiative are not required by the federal constitution. Only about half the states have them. States retain "considerable leeway" in regulating the initiative process. *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020) (C.J. Roberts, concurring) (quoting *Buckley v. American Constitutional Law Foundation, Inc.* 525 U.S. 182,191 (1999)). Even if state laws regulating the initiative process implicate the First Amendment, "reasonable, non-discretionary restrictions are almost certainly justified by the important regulatory interests." *Id*. Further, it "is by no means necessary for a State to prove that . . . reasonable, nondiscriminatory restrictions are narrowly tailored to its interest." *John Doe No. 1 v. Reed*, 561 U.S. 186, 212-13 (2010) (J. Sotomayor, concurring).

Pursuant to its constitutional mandate, the Utah Legislature enacted Utah Code § 20A-7-101 *et seq* to govern the time, manner, and conditions of issues submitted to the voters, including initiatives. These regulations help ensure that issues reaching the voters enjoy a modicum of support

---

[1] UTAH CONST. art. VI, §1.
[2] UTAH CONST. art. VI, § 2(a)(i).

from real voters, and not from fictitious people.[3] The regulations, especially the deadlines, also help ensure the running of orderly and fair elections, not just for ballot issues submitted to the people but also for candidate elections. The deadlines create a manageable workload for county clerks who are tasked with verifying signatures, in addition to the host of other daily responsibilities.  Without the deadlines, signature submissions for candidates, initiatives, and referenda are funneled together into a short window in which the county clerks would need to verify hundreds of thousands of signatures on a rushed schedule. This might lead to some invalid signatures being accepted and some valid signatures being rejected. And this can often lead to additional expense related to hiring additional staff to verify signatures. With the deadlines, however, signature verification is spread out and eases the administrative burden on county clerks. These regulations are reasonable and nondiscriminatory. They do not violate the Constitution.

Plaintiff Tracie Halvorsen and other individuals (the "Sponsors") filed an initiative application on May 2, 2023.[4] For nine months, the Sponsors gathered signatures and did not seek judicial relief from election regulations. Then, on the eve of their deadline to submit all signatures, and about 50,000 signatures short of the statutory threshold, they commenced this action and demanded expedited injunctive relief. Plaintiffs' choice to sit on their claims for nine months and not prosecute them implicates both the irreparable harm and likelihood of success prongs of the preliminary injunction standard. Their lack of diligence and the corresponding prejudice to the Lieutenant Governor and the county clerks subject their Motion, and their Complaint, to dismissal based on laches. *See Archer v. Griswold*, 638 F. Supp. 3d 1246, 1256-57 (D. Colorado 2022). As set

---

[3] *See, e.g.*, "Workers forged signatures on Utah petitions for medical marijuana and Count My Vote, charges say," Salt Lake Tribune, March 1, 2018
https://www.sltrib.com/news/2018/03/01/workers-forged-signatures-on-utah-petitions-for-medical-marijuana-and-count-my-vote-charges-say/.
[4] Plaintiff Are You Listening Yet PAC is not a sponsor of the initiative.

forth further herein, the Court would be well within its authority and aligned with precedent to deny the Motion based on laches alone.

Plaintiffs complain of nine provisions of the Election Code and ask this Court not only for drastic prohibitory injunctions to enjoin the enforcement of portions of the Election Code,[5] but also for particularly disfavored mandatory injunctions to compel the Lieutenant Governor to act.[6] Granting Plaintiffs' requested relief would harm the public interest by shifting election deadlines upon which the Lt. Governor, Eelction Office, county clerks, candidates, and voters have relied.

In order to prevail in their request for a preliminary injunction, Plaintiffs must demonstrate that they satisfy all four prongs of the preliminary injunction standard. They cannot prevail on any one of them, let alone all four. The Court should deny the Motion. The Court should decline to exercise supplemental jurisdiction over Plaintiffs' state constitutional claims but, even if it does, the Court should find the provisions of the Election Code of which Plaintiffs complain pose no undue burden on their right to initiate legislation and thus, no state constitutional violation.

## DEFENDANT'S STATEMENT OF FACTS

### *The Legislature designates a new flag and a historic flag*

1.   In its 2023 general session, the Utah Legislature enacted S.B. 31, State Flag Amendments, codified in Utah Code § 63G-1-501 *et seq. See* Declaration of Ryan Cowley ("Cowley Dec."), ¶ 3. The Cowley Dec. is attached hereto as Exhibit 1.

2.   S.B. 31 established a new state flag of Utah and designated the prior flag as the "historic state flag." *Id.* at ¶ 4; *see also* UTAH CODE § 63G-1-503(1).

3.   S.B. 31 states, "All citizens maintain the right to use the historic state flag upon any occasion

---

[5] *See* Pls.' Mot. for Prelim. Inj., ECF No. 2, request nos. 2, 3, 5, 8, 9, and 10.
[6] *Id.*, request nos. 1, 4, 6, and 7 (order the Lieutenant Governor to "order all county clerks to consider these pages valid to assess signatures," "order the Lieutenant Governor to approve a signature page that can accommodate 10 signatures before March 1," "direct the Lieutenant Governor to order all county clerks to provide the names of rejected signatures in the same manner as accepted signatures are disclosed").

deemed fitting and appropriate." *Id.* at ¶ 5; *see also* UTAH CODE § 63G-1-503(3).

### The Referendum effort

4.    On March 6, 2023, eight individuals (not parties to this case) filed an application to sponsor a referendum on S.B. 31 (the "Referendum"). *Id.* at ¶ 6. A true and correct copy of the Referendum application is attached hereto as Exhibit 2.

5.    To qualify the Referendum for the ballot, the sponsors needed to gather 134,298 valid signatures statewide (8% of active voters in the state), including signatures from 8% of active voters in 15 out of 29 senate districts. *Id.* at ¶ 7; *see also* UTAH CODE § 20A-7-301(1).

6.    The deadline to gather and submit the signatures for the Referendum was April 12, 2023. *Id.* at ¶ 8; *see also* UTAH CODE § 20A-7-105(5)(ii).

7.    The Referendum sponsors submitted 51,596 signatures to County Clerks. Of those, clerks validated 21,030 signatures and rejected 2,117 signatures. The remaining 28,449 signatures were submitted at the deadline and therefore not verified in accordance with Utah Code § 20A-7-307(3). The Referendum fell short of the required threshold by more than 82,000 signatures. *Id.* at ¶ 9.

8.    The Lieutenant Governor notified the Referendum sponsors that the Referendum would not be placed on the ballot due to insufficient signatures. A true and correct copy of the Lieutenant Governor's letter to the sponsors is attached hereto as Exhibit 3.

### The Initiative effort

9.    On May 2, 2023, Plaintiff Tracie Halvorsen and others, including some who sponsored the Referendum petition, filed an application with the Lieutenant Governor's Office to sponsor an initiative (the "Initiative) that would: (1) repeal S.B. 31; (2) provide for one Utah flag; (3) provide that all proposed adoptions of a new state flag be submitted to the voters of the state; and (4) provide that modification of the state flag and expenditures made in modifying the state flag be submitted to the voters. *See* Cowley Dec., Exhibit 1, ¶ 10. A true and correct copy of the Initiative application is attached hereto as Exhibit 4.

10. Plaintiff Are You Listening Yet PAC was not a sponsor of the Initiative. *Id.* at ¶ 11.

11. The Initiative sponsors indicated on their application that "persons gathering signatures for the petition will not be paid. Their efforts will be on a voluntary basis." *See* Initiative application, Exhibit 4, p. 1.

12. As of February 15, 2024, the final deadline for submitting signatures set forth in Utah Code § 20A-7-105(5)(a)(i)(C), Initiative sponsors submitted 99,125 signatures. Of the signatures submitted, 81,992 were verified by county clerks and 13,110 were determined to be invalid. The remaining 4,023 signatures were submitted at the deadline, and therefore not verified in accordance with Utah Code § 20A-7-307(3). The sponsors fell over 50,000 signatures short of the required signature threshold. As of February 21, 2024, only 2,075 signatures had been rejected because they were part of signature packets submitted beyond the statutory 30-day deadline of Utah Code § 20A-7-105(5)(a)(i)(A). *See* Cowley Dec., Exhibit 1, ¶ 12.

13. In addition to failing to meet the required 8% signature threshold statewide, the sponsors met the required 8% signature threshold in only one of the 26 required senate districts. *Id.* at ¶ 13.

### *The administrative burden on County Clerks and the Lieutenant Governor's Office in running elections*

14. County clerks shoulder much of the work in administering elections. They verify signatures for statewide and local initiatives and referenda, as well as for statewide and local candidates for office. They remove signatures when requested. They maintain voter registration records. They design, prepare, and mail ballots. They prepare voter information pamphlets. They program and test ballot tabulation equipment. They receive and count ballots. They report vote totals to the public and to the board of canvass for certification. *Id.* at ¶ 14.

15. In addition to their election related responsibilities, county clerks fulfill a number of other responsibilities that may include, but are not limited to the following: issuing marriage

licenses, accepting passport applications, taking council and commission meeting minutes, building agendas, publishing public meeting notices, issuing business licenses, performing human resource duties, serving as the clerk of the court, etc. Nineteen of the 29 county clerks also serve as county auditors. *Id.* at ¶ 15.

16. For a petition signature to be valid, whether for initiative, referendum, or candidate, the signature must be from a registered voter who lives within the appropriate voting district. *Id.* at ¶ 16; *see also* UTAH CODE § 20A-7-105(3).

17. County clerks verify each signature by checking to see whether the individual is a registered voter and lives within the appropriate voting district, and by comparing each signature with the voter's signature on file (driver's license, voter registration card, etc.). Clerks also match the signer's name, address, and/or age against the information in the state's voter database ("VISTA"). This information may also be used to help find a voter in the registration system. *Id.* at ¶ 17; *see also* Utah Code §§ 20A-7-105(3), 20A-9-403(3)(a), & 20A-1-1002.

18. With respect to candidates for office, county clerks must validate signatures within 14 days, and no later than a political party's convention. *Id.* at ¶ 18; *see also* UTAH CODE § 20A-9-408(9)(c).

19. With respect to initiatives and referenda, county clerks must validate each signature within 21 days of receiving a signature packet. *Id.* at ¶ 19; *see also* UTAH CODE § 20A-7-105(6).

20. With respect to statewide referenda, applications must be submitted within five days of the close of the legislative session. *See* UTAH CODE § 20A-7-302(1). Signature gathering happens immediately thereafter because signatures must be submitted to the county clerks no later than 40 days after the session ends. *Id.* at ¶ 20; *see also* UTAH CODE § 20A-7-105(5)(a)(ii)(B).

21. Because general legislative sessions typically conclude at the beginning of March, county clerks are likely to be busy validating signatures for a referendum during March and early April. *Id.* at ¶ 21.

22. Additionally, in regular election years (even numbered years), political office candidates may

begin gathering signatures in January. Candidates may submit signatures to clerks for verification as soon thereafter as they gather the required number of signatures, then supplement their initial submission as many times as they wish prior to the deadline. Candidates typically begin submitting them in March in advance of the deadline set forth in Utah Code § 20A-9-403(3). As of February 22, 2024, county convention dates range from March 23 through April 20, with state conventions scheduled for April 27, prior to the primary election. *Id.* at ¶ 22.

23. The Lieutenant Governor is the chief election officer of the state and is responsible to oversee, and generally supervise, all elections and functions relating to elections in the state. The Lieutenant Governor accepts federal and state candidate filings and reviews initiative and referendum applications, prepares signature sheets, and works closely with county clerks throughout elections. The Lieutenant Governor is responsible for verifying the signatures of the following candidates: federal, statewide, as well as all multi-county legislative and state school board seats. Her office contracts with Davis County to verify these signatures. County clerks (including Davis) must verify signatures for all single county legislative and state school board seats along with any other county candidates who gather signatures. *Id.* at ¶ 23. *See also* UTAH CODE § 67-1a-2(2).

24. Thus, county clerks typically become busy validating federal, state, and local candidate petition signatures in March and April prior to the primary election, on top of validating referenda petition signatures. When clerks, particularly in large counties, become busy validating signatures, they are forced to hire additional, temporary staff to get them verified on time. *Id.* at ¶ 24.

### *Initiative requirements and their relation to governmental interests*

#### Signature requirements

25. As with referenda, sponsors seeking to have an initiative submitted to the people must obtain valid signatures from 8% of active voters statewide, which currently amounts to 134,298 signatures. *Id.* at ¶ 25; *see also* UTAH CODE § 20A-7-201(2)(a)(i).

26. Additionally, sponsors of a statewide initiative must obtain valid signatures from 8% of

active voters from at least 26 of the 29 senate districts. *Id.* at ¶ 26; *see also* UTAH CODE § 20A-7-201(2)(a)(ii).

27. Signature requirements fulfill the State's interest in ensuring that ballot issues demonstrate a modicum of support so that "some sort of order, rather than chaos" accompanies the democratic process. *See Storer*, 415 U.S. at 730.

<u>Deadlines</u>

28. There are three pertinent deadlines for statewide initiatives. Sponsors must submit signature packets to the county clerks of the county in which the packet was circulated no later than the earlier of:

     a.   30 days after the day on which the first individual signs an initiative packet;

     b.   316 days after the day on which the application for the initiative petition is filed; or

     c.   the February 15 immediately before the next regular election immediately after the application is filed.

*See* Cowley Dec., Exhibit 1, ¶ 27; *see also* Utah Code § 20A-7-105(5).

29. The requirement for a signature packet to be submitted within 30 days of the first signature applies to each individual signature packet, and does not represent the total time to collect signatures. *Id.* at ¶ 28.

30. The rolling submission window created by the 30-day deadline makes verifying signatures more manageable for county clerks. It is administratively burdensome for clerks to review many signatures all at once at the end of the gathering period. A rolling deadline also serves the sponsors' interest by providing them updated valid signature totals so they know how many are left to obtain before the final deadline. *Id.* at ¶ 29.

31. In 2018, prior to the creation of the 30-day rolling deadline, county clerks verified hundreds

of thousands of signatures for four successful and one unsuccessful initiative campaigns. The bulk of these signatures were received towards the end of the signature gathering deadline, and then had to be reviewed within a short window of time. *Id.* at ¶ 30.

32. The required maximum 316-day signature gathering window for all signatures serves the government's interest to ensure a modicum of *current* support for the proposed law.

33. In 2018, the Utah Medical Cannabis Statewide Initiative gathered 153,894 valid signatures in a period of 6 ½ months. *Id.* at ¶ 31.

34. In 2018, the Utah Decides Healthcare Act Statewide Initiative gathered 147,280 valid signatures in a period of 2 ½ months. *Id.* at ¶ 32.

35. In 2018, the Direct Primary Election Act (Count My Vote) Initiative gathered 131,984 valid signatures in a period of 4 months. *Id.* at ¶ 33.

36. In 2018, the Independent Redistricting Commission Statewide Initiative gathered 150,082 valid signatures in 2 ½ months. *Id.* at ¶ 34.

37. In 2019, the Referendum on Tax Restructuring Revisions gathered 144,674 valid signatures statewide in just five weeks. Fred Cox, who is also the contact sponsor of this Initiative, was a sponsor the leader of the Referendum on Tax Restructuring Revisions. The bill was signed on December 18, 2019 and the referendum was deemed sufficient on January 21, 2019. *Id.* at ¶ 35.

38. The February 15 deadline serves the government's administrative interest by distributing the work county clerks would be required to do in March and April of an election year. With a February 15 deadline for sponsors to submit signatures, and a 21-day deadline for clerks to verify them, the clerks may be free by the second week of March from initiative signatures, thus allowing them to begin processing candidate petition signatures and referendum signatures as necessary. *Id.* at ¶ 36.

<u>Payment restrictions</u>

39. Signature gatherers may not be paid per signature, per verified signature, or on the condition

9

that the initiative or referendum qualifies for the ballot. *Id.* at ¶ 37; *see also* UTAH CODE § 20A-7-104(1)-(3).

40. Rather, signature gatherers for a ballot initiative may only be paid on an hourly rate. *Id.*

41. The Initiative sponsors indicated on their application that they elected not to use paid signature gatherers, and never indicated a desire to change that designation. *Id.* at ¶ 38; *see also* Exhibit 4, Initiative application.

42. Even if Plaintiffs had standing to challenge this provision, the payment restrictions serve the government's interest in combatting fraud / forgery in elections. *Id.* at ¶ 39.

<u>Residency requirement</u>

43. Prior to the 2024 general session, Utah Code § 20A-7-105(4)(a)(i) required a person circulating signature packets to be a resident of Utah. *Id.* at ¶ 40.

44. The Utah Legislature has recently repealed this requirement. *Id.* at ¶ 41. *See also* S.B. 107. A copy of S.B. 107 is attached hereto as Exhibit 5.[7]

45. The Initiative sponsors indicated on their application, which was submitted on May 2, 2023, that they elected to use only volunteers to gather signatures, not paid signature gatherers. *Id.* at ¶ 38; *see also* Exhibit 4, Initiative application.

46. Plaintiffs acknowledge in their Complaint that the residency requirement would affect them only insofar as they wished to contract with out-of-state signature gathering companies. *See* Pls.' Complaint, ECF No. 1, ¶ 24.

<u>Packet Retrieval Prohibition</u>

47. Utah Code § 20A-7-105(10) prohibits a person from retrieving a packet submitted to a

_____

[7] Governor Cox is expected to sign S.B. 107 prior to the hearing in this case scheduled for March 1, 2024, upon which the repeal becomes effective. The Lt. Governor will notify the court when SB 107 officially becomes law.

county clerk or making any alterations or corrections to a packet after the packet is submitted to the county clerk. However, counties post lists of valid signatures on the Lieutenant Governor's website for the sponsors and signers to see whether signatures have been accepted or not. *See* Cowley Dec., Exhibit 1, ¶ 42.

48. This law serves the government interest of preventing fraud by, for example, preventing the altering signature dates and re-submitting the packets. *Id.* at ¶ 43.

49. For this very Initiative, the Davis County Attorney is investigating at least two circulators for fraudulently altering signature dates and otherwise altering the pages of petition packets. Several other packets had dates blacked out to obscure the fact that the signatures were collected more than 30 days before the packets were submitted to the county clerks for verification. *Id.* at ¶ 44.

Format of Signature Sheets

50. Utah Code § 20A-7-203(3) contains requirements for the formatting of initiative signature sheets. *Id.* at ¶ 45.

51. Each of the requirements serve important governmental interests such as helping the clerk identify the signer to verify the signature, ensuring that signers are informed, and warning against fraudulent activity. *Id.* at ¶ 46.

52. Additionally, the Initiative Sponsors approved the format of the signature packets on June 12, 2023, and raised no objections at that time. *Id.* at ¶ 47. A true and correct copy of the email exchange between sponsor Fred Cox and the Lieutenant Governor's Office in which Mr. Cox approves the format is attached hereto as Exhibit 6.

Prohibition on signing a petition more than once

53. Utah Code § 20A-7-213(1)(b) prohibits an individual from knowingly signing the individual's name more than once for the same initiative at one election. *Id.* at ¶ 48.

54. This requirement serves the straightforward government interest of preventing individuals

from signing petitions more than once. Allowing an individual to sign more than once exaggerates the support for the initiative and harms the State's interest in ensuring that there is a modicum of support for ballot issues. *Id.* at ¶ 49.

<u>Warning against criminal behavior</u>

55. Utah Code § 20A-7-203(3)(f)(iv) requires a warning to be printed on each signature sheet warning individuals that it is a class A misdemeanor for an individual to sign and initiative petition with a name other than the individual's own name, or to knowingly sign the individual's name more than once for the same petition, or to sign an initiative petition when the individual knows that the individual is not a registered voter. *Id.* at ¶ 50.

56. The requirement serves the governmental interests of deterring fraud and providing notice of criminal behavior to ensure due process.

**STANDARD OF REVIEW**

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (internal quotation marks and citation omitted). Before a preliminary injunction may be entered, the moving party must establish that (1) the movant will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits. *Id.* To obtain a preliminary injunction, the movant must establish all four preliminary injunction factors. *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008).

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (internal quotation marks and citation omitted). Further, an injunction mandating action, such as many of the requests here, as opposed to

prohibiting action, is a particularly disfavored remedy, and movants face a heightened burden. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004).

## ARGUMENT

I.   **Plaintiffs' claims of irreparable harm (as well as their claims on the merits) are barred by laches**

"Equity aids the vigilant and not those who slumber on their rights." *Biodiversity Conservation All. V. Jiron*, 762 F. 3d 1036, 1090-91 (10th Cir. 2014) (internal quotation omitted). Laches is an equitable doctrine that bars a party's dilatory claim and is based upon the lack of diligence by the party against whom it is asserted and prejudice to the party asserting it as a defense. *Costello v. United States*, 365 U.S. 265, 282 (1961). "[C]onstitutional claims are not immune from the reach of laches[.]" *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1302 (10th Cir. 2012) (internal citation omitted)

In the context of a motion for a preliminary injunction, some courts have analyzed a laches defense under the irreparable harm prong, and some have analyzed it under the likelihood of success on the merits prong. *See Archer*, 638 F. Supp. at 1256-57. Here, the Lieutenant Governor invokes it under both prongs, providing more detailed review of the doctrine in this section with respect to Plaintiffs' alleged irreparable harm, and incorporating those arguments by reference in subsequent sections with respect to Plaintiffs' (un)likelihood of success on the merits.

"Regardless of the prong, courts have routinely expressed concerns regarding last-minute election-related challenges." *Id.* at 1257. Thus, "applications for a preliminary injunction granting ballot access have been consistently denied when they threaten to disrupt an orderly election." *Perry v. Judd*, 471 F. App'x 219, 227 (4th Cir. 2012) (unpublished). As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990).

The first factor the Court considers in a laches defense is whether Plaintiffs demonstrated a lack of diligence in asserting their claims. *Archer*, 638 F. Supp. 3d at 1257. Here, it is undisputed that Plaintiffs slept on their claims. They could have brought them any time since last May. But they waited until the eve of the final submission deadline to bring this action, then demanded expedited consideration. In *Archer*, the court found that a candidate who waited a little over six months to bring his election law claims demonstrated a lack of diligence. Here, Plaintiffs waited 10 months to bring their claims. Because such dilatory behavior subjects Plaintiffs' Complaint to dismissal, it certainly also subjects their Motion for Preliminary Injunction to denial.

The second factor of the laches test is prejudice to the defendant. Here, the Lieutenant Governor and the county clerks are prejudiced by Plaintiffs' delay. Changing election deadlines and other requirements at this late stage threatens to throw a massive wrench into the machinery of the election. It would require restarting the entire initiative process, and doing so in the middle of a presidential election year primary, with all the attendant federal, state, and local elections.

The Court here should be guided by the "Purcell Principle." Briefly, the Purcell Principle holds that "a State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). As such, "it stands for the proposition that courts will not disrupt imminent elections absent a powerful reason to do so." *Archer*, 638 F. Supp. at 1259. The United States Supreme Court has recently emphasized these points:

> [R]unning a statewide election is a complicated endeavor. Lawmakers initially must make a host of difficult decisions about how best to structure and conduct the election. Then, thousands of state and local officials and volunteers must participate in a massive, coordinated effort to implement the lawmakers' policy choices on the ground before and during the election, and again in counting the votes afterwards .... The principle also discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process. For those reasons, among others, *this Court has regularly cautioned that a federal court's last-minute interference with state election laws is ordinarily inappropriate.*

*Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 31 (2020) (J. Kavanaugh, concurring) (emphasis added).

14

The Tenth Circuit recognizes that "delay in seeking [injunctive] relief cuts against finding irreparable injury." *Kan. Health Care Ass'n. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F. 3d 1536, 1543-44 (10th Cir. 1994) (quotation and citation omitted). Here, Plaintiffs' 10-month delay in seeking injunctive relief strongly cuts against a finding of irreparable harm. And because Plaintiffs must meet their burden to demonstrate all four prongs, their Motion may be denied on this basis alone.

**II.    Plaintiffs are not likely to succeed on the merits**

   *A.   Standard of Review*

        1.   The interplay of federal constitutional law with state-created rights of initiative and referenda

Before addressing Plaintiffs' claims, it is important to properly frame the interaction of federal constitutional rights with state-created rights to sponsor direct democracy measures. The right to sponsor an initiative in Utah is not protected by the federal Constitution. *See Save Palisade Fruitlands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) ("[N]othing in the language of the Constitution commands direct democracy[.]"). Direct democracy measures, such as initiative, referendum, and recall, are state-created rights and *not* "objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [they] were sacrificed." *Petrella v. Brownback*, 787 F.3d 1242, 1261 (10th Cir. 2015).

To be certain, if a state chooses to provide for direct democracy measures, it cannot implement statutory regulations of those measures that violate the federal Constitution. For example, if a state were to pass a law limiting the right of initiative to white people, the law would violate the Equal Protection Clause. Nevertheless, the Supreme Court has repeatedly affirmed that states have considerable leeway to implement reasonable, non-discriminatory measures to regulate their initiative and referenda processes.

Recognizing the broad discretion states retain in this arena, the Supreme Court recently granted an emergency stay of a district court order that ordered Idaho to change its initiative procedures. *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020). In explaining the decision, Chief Justice Roberts wrote that "States retain 'considerable leeway to protect the integrity and reliability of the initiative process.'" *Id.* (C.J. Robert, concurring) (quoting *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 191 (1999)). He continued, "This is not a case about the right to vote, but about how items are placed on the ballot in the first place. Nothing in the Constitution requires Idaho or any other State to provide for ballot initiatives." *Id.* at 2617. He concluded, "Even assuming that the state laws at issue implicate the First Amendment, such *reasonable, non-discriminatory restrictions are almost certainly justified by the important regulatory interests.*" *Id.* (emphasis added).

Elsewhere, Justice Sotomayor has written:

> In assessing the countervailing interests at stake in this case, we must be mindful of the character of initiatives and referenda. These mechanisms of direct democracy are not compelled by the Federal Constitution . . . States enjoy considerable leeway to . . . specify the requirements for obtaining ballot access . . . It is by no means necessary for a State to prove that . . . reasonable, nondiscriminatory restrictions are narrowly tailored to its interests.

*John Doe No. 1 v. Reed*, 561 U.S. 186, 212-13 (2010) (J. Sotomayor, concurring) (internal quotations and citations omitted).

This proper framing of the issues presented to the Court informs the standard of review the Court should apply to assess each of Plaintiffs' claims. Those standards are discussed herein in conjunction with the claims. The starting point for the Court's analysis, though, is that states have considerable leeway to regulate their own direct democracy measures.

2.   The *Anderson-Burdick* balancing test for Plaintiffs' federal claims

States must regulate their elections, including referenda and initiative campaigns, to ensure they are conducted in a fair and orderly fashion. *See, e.g., Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Burdick v. Takushi*, 504 U.S. 428, 433 (1992). To require every campaign

regulation be narrowly tailored to serve a compelling interest "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick,* 504 U.S. at 433.

Consequently, the Supreme Court has developed a framework for assessing the constitutionality of state election laws. When a state's rule imposes *severe* burdens on speech or association, it must be narrowly tailored to serve a compelling interest. However, lesser burdens trigger a less exacting review, and a state's important regulatory interests are typically enough to justify reasonable restrictions. *Id.* at 434. *See also Anderson v. Celebrezze*, 460 U.S. 780, 788-90 (1983); *Buckley*, 525 U.S. at 206-207 (J. Thomas, concurring).  This has come to be known as the *Anderson-Burdick* balancing test.  *See Fish v. Schwab*, 957 F.3d 1105, 1121 (10th Cir. 2020). Reasonable, non-discriminatory regulations constitute lesser burdens. *John Doe No. 1*, 561 U.S. at 212-13 (2010) (J. Sotomayor, concurring). Such regulations are subject to rational basis review. *See Burdick*, 504 U.S. at 434.

### 3.   Supplemental jurisdiction and the undue burden test for Plaintiffs' state claims

Plaintiffs request that this Court exercise supplemental jurisdiction to determine whether the nine provisions of the Election Code they find problematic under the federal Constitution also violate Article VI, sec. 1 of the Utah Constitution.

As an initial matter, the Court is not required to exercise supplemental jurisdiction and should decline to do so here. 28 U.S.C. § 1367(c) states that "district courts may decline to exercise supplemental jurisdiction over a claim . . . if the claim raises a novel or complex issue of State law, . . . the district court has dismissed all claims over which it has original jurisdiction or . . . there are other compelling reasons for declining jurisdiction." Because we are still at the preliminary injunction stage of the proceedings, the Court has not yet dismissed Plaintiffs' claims brought pursuant to the Court's original jurisdiction. Nevertheless, those claims are subject to dismissal. With no federal claims left to adjudicate, the Court should decline jurisdiction over Plaintiffs' state claims.

Further, the Court may decline jurisdiction under subparts (1) & (4) of § 1367(c) because Plaintiffs have not briefed their state constitutional claims, making minimal reference to state law in their Motion for Preliminary Injunction. There is no reason for the Court to take "Erie-guesses" at how Utah state courts might resolve Plaintiffs' novel claims under the state Constitution. It would be better to let state courts have the first crack at those.

If the Court proceeds to analyze Plaintiffs' state constitutional claims, the test for reviewing them is similar to the federal *Anderson-Burdick* test. To determine whether a statutory framework unconstitutionally infringes the right to conduct an initiative campaign, the Utah Supreme Court has "articulated an 'undue burden' test aimed at respecting both the rights of voters . . . and the prerogatives of the legislature to regulate the terms and conditions of the exercise of that right." *Count My Vote, Inc. v. Cox*, 2019 UT 60, ¶ 44, 452 P.3d 1109. The Court has noted that "the rights of voters in this field are 'not unfettered, but come[ ] with a built-in limitation." *Id.* at ¶ 43 (quoting *Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State*, 2004 UT 32, ¶ 28). The "qualified or 'self-limiting' nature of the . . . rights of the people means that legislative restrictions in this field are not . . . subjected to heightened scrutiny." *Id.* Supreme Court precedents "thus call for the court to weigh or balance the two components of article VI, section 1 – the voters' right to [initiate laws], and the built-in limitation on that right (in the legislature's expressly delegated power to prescribe terms and conditions on its exercise)." *Id.* at ¶ 45.

B.  *Plaintiffs are not likely to succeed on the merits of any of their claims because those claims are barred by laches*

The Lieutenant Governor incorporates the arguments set forth in Part I.

C.  *Plaintiffs are not likely to succeed on the merits of their claims alleging that the deadlines are unconstitutional*

"As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and is some sort of order, rather than chaos is to accompany the democratic process." *Burdick*, 504 U.S. at 433 (citing *Storer*, 415 U.S. at 730. Election deadlines are essential to running an

orderly and fair election. County clerks and the Lieutenant Governor's Office are tasked not just with running a general election in November, but primary elections as well, taking place in spring and early summer. Federal law imposes strict deadlines on the preparation and mailing of both primary and general election ballots. *See, e.g.*, the Uniformed and Overseas Absentee Voting Act, 52 U.S.C. § 20301 *et seq.* County clerks and the Lieutenant Governor's Office are busy with election matters on an ongoing basis, but especially so during even-numbered, regular election years.

   1.   The 316-day window is not severe and serves legitimate and important government interests

Under Utah law, those wishing to sponsor an initiative may take advantage of a 316-day window (more than 10 months) in which to gather signatures. *See* UTAH CODE § 20A-7-105(5). They may gather signatures in northern Utah during the gorgeous spring months of May and June, and spend winter months in southern Utah where they could also go golfing when they are not gathering signatures.

The 316-day window is an ample amount of time to gather signatures. Indeed, the United States Supreme Court analyzed a Georgia law requiring non-party candidates for office to procure signatures within a 180-day window, and found no constitutional violation. *Jenness v. Fortson*, 403 U.S. 431 (1971).

Recent Utah history with initiatives and referenda demonstrates how 316 days is about two or three times the amount of time it usually takes to gather signatures for ballot issues that actually resonate with the people:

   -   In 2018, the Utah Medical Cannabis Statewide Initiative gathered 153,894 valid signatures in a period of 6 ½ months;[8]

   -   In 2018, the Utah Decides Healthcare Act Statewide Initiative gathered 147,280 valid

_____

[8] *See* Def.'s Statement of Fact No. 33.

signatures in a period of 2 ½ months;[9]

-   In 2018, the Direct Primary Election Act (Count My Vote) Initiative gathered 131,984 valid signatures in a period of 4 months;[10]

-   In 2018, the Independent Redistricting Commission Statewide Initiative gathered 150,082 valid signatures in 2 ½ months;[11]

-   Most dramatically, the Referendum on Tax Restructuring Revisions in 2019, sponsored by Fred Cox (who is also a sponsor of this Initiative), gathered 144,674 valid signatures in just five weeks.[12] Notably, sponsors of this successful signature gathering effort for the Referendum on Tax Restructuring gathered signatures in the middle of winter, over the holidays.[13]

While they could have started 27 days earlier, the Sponsors of this Initiative filed the Initiative application on May 2, 2023, which allotted them 289 days prior to February 15 in which to gather signatures. They thus had 249 more days (8 more months) than Mr. Cox had to successfully gather signatures for his referendum on the Tax Restructuring Revisions. Clearly, this Initiative has not resonated with voters in the way that Mr. Cox's tax referendum did. Mr. Cox's referendum and the other successful initiatives demonstrate that the 316-day window certainly poses no burden on sponsors, let alone a severe burden that would require some kind of heightened scrutiny.

The 316-day window serves the important government interest of demonstrating a modicum of *current* support for the initiative. An Ohio law creating a one-year period for signature gathering was upheld against constitutional challenge because the state had a "legitimate interest in requiring independent candidates to demonstrate a modicum of *current* support prior to the State placing them on the ballot." *Ducan v. Husted*, 125 F. Supp. 3d 674, 687 (S.D. Ohio 2015) (emphasis in original).

---

[9] *See* Def.'s Statement of Fact No. 34.
[10] *See* Def.'s Statement of Fact No. 35.
[11] *See* Def.'s Statement of Fact No. 36.
[12] *See* Def.'s Statement of Fact No. 37.
[13] In response to the successful signature gathering effort, the Utah Legislature repealed the Tax Restructuring Revisions shortly thereafter.

Voters die, voters move, voters change their minds over time. Utah's 316-day window serves the State's legitimate and important governmental interest of ensuring that the current pool of voters supports placing the initiative on the ballot.

    2. <u>The February 15 deadline is not severe and serves legitimate and important government interests</u>

Given the 316-day available window for gathering signatures, the February 15 deadline set forth in Utah Code § 20A-7-105(5) for submission is not severe. There is no time crunch for gathering signatures, except that which might be self-imposed by late starters. And the February 15 deadline does not preclude sponsors from advocating for their initiative once it does qualify for the ballot.

The February 15 deadline serves the government interest of ensuring that order, rather than chaos, accompanies the democratic process. It distributes the work for county clerks in a more even way, such that they can administer elections for initiatives, referenda, federal candidates, state candidates, and local candidates without being inundated with signature verification all at once. The February 15 deadline helps them meet federal requirements for ballot preparation and submission. Without the February 15 deadline, county clerks would be inundated in Spring and early Summer with initiative signatures at the same time they are attempting to verify hundreds of thousands of candidate petition signatures and referenda signatures, as well as running a primary election. A cut-off date of February 15 is not unreasonable given the State's interests.

Plaintiffs cite to *SD Voice v. Noem*, 60 F. 4th 1071 (8th Cir. 2023) for the proposition that the February 15 deadline is too early and denies them the ability to advocate fully for their cause.[14] However, the "Supreme Court has acknowledged that 'some cut off period is necessary . . . to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges." *Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd.*, 844 F. 2d 740, 745 (10th Cir.

---

[14] *See* Pls.' Memo in support of Mot. for Prelim. Inj., ECF No. 2, p. 7.

1988) (quoting *American Party v. White*, 415 U.S. 767, 787 n.18 (1974). *SD Voice* is distinguishable from this case because: (1) South Dakota's cut-off period was 3 months earlier than Utah's, and (2) South Dakota did not put on evidence of its government interest in its deadline. Here, the Lieutenant Governor has provided the Court with evidence that justifies the State's February 15 deadline: county clerks can better administer multiple elections if they can spread the work of signature verification over a few more weeks.

      3.   The 30-day submission deadline for signature packets is not a severe burden and serves the State's legitimate and important government interests

As with the February 15 deadline, the 30-day submission deadline for signature packets set forth in Utah Code § 20A-7-105(5) serves the State's interest by spreading out the work of the county clerks. For those sponsors who gather signatures across the ten-month time frame, clerks receive the signature packets over time, rather than being inundated with signatures all at once. The 30-day deadline also works to the benefit of sponsors by giving them updated totals on how many signatures have been verified and, thus, how many they have left to obtain. If county clerks waited until the February 15 deadline to verify signatures, sponsors would not have an opportunity to go gather more signatures should too many be rejected as invalid.

     D.  *Plaintiffs are not likely to succeed on the merits of their claim that the circulator payment restrictions are unconstitutional*

Plaintiffs challenge the prohibition on per-signature compensation for paid circulators. Plaintiffs lack standing to challenge this section because they elected not to use paid signature gatherers. Even if they had standing, their claim fails.

Utah Code § 20A-7-104(1) states that for an initiative or referendum petition, a "person may not pay a person to gather signatures . . . based on a rate per signature" or "on a rate per verified signature." Plaintiffs allege that this statute is unconstitutional, but this claim fails. The compensation requirement does not restrict anyone from circulating a petition. Nor does the

compensation requirement restrict speech.  For those reasons, multiple circuit courts of appeals have upheld laws prohibiting per-signature compensation.

### 1.   The pay-per-signature restriction is not a severe burden

Plaintiffs fail to meet their burden to demonstrate that the compensation requirement severely burdens their First Amendment rights. First, the law only regulates payment methodology. The law does not prohibit speech, nor does the law regulate any message the circulators communicate to voters during signature gathering. The prohibition on per-signature payment does not silence a single voice. Nor does the law prevent a group from using money to amplify its message.

Multiple circuit courts have come to that conclusion.  In *Pierce v. Jacobsen*, 44 F.4th 853, 857 (9th Cir. 2022), the plaintiffs challenged Montana's law that bars paying signature gatherers based upon the number of signatures obtained. The district court held that the pay-per-signature restriction does not impose a severe burden on First Amendment rights and that the state established that an important regulatory interest is furthered by this restriction. *Id.* The Ninth Circuit affirmed these holdings.

The plaintiffs in that case argued that the pay-per-signature restriction imposed a severe burden on speech. *Id.* at 864. Specifically, the plaintiffs contended that the restriction reduces the pool of available circulators and makes signature gathering more expensive. The Ninth Circuit found that the plaintiffs did not show that the pay-per-signature restriction imposes a severe burden on speech. The court found that the pay-per-signature restriction "does not categorically limit the pool of circulators. Instead, if some signature gatherers will only work on a per-signature basis, that is their choice." *Id.*

Similarly, in *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001), the Eighth Circuit upheld North Dakota's statute which prohibited payment to petition circulators on a basis related to the number of signatures obtained.  The Court of Appeals found that the plaintiffs failed

to show a severe burden on their rights because the statute "only regulates the way in which circulators may be paid" and "does not involve the complete prohibition of payment." *Id.* at 617. *See also Pers. v. New York State Bd of Elections*, 467 F.3d 141, 143 (2d Cir. 2006) ("We join the Eighth and Ninth Circuits in holding that a state law prohibiting the payment of electoral petition signature gatherers on a per-signature basis does not per se violate the First or Fourteenth Amendments.").

2. The pay-per-signature restriction is justified by the State's interest in fraud prevention

As the pay-per-signature restriction is not a severe burden, the law is constitutional because it is justified by the State's important interest in preventing fraud and deterring forgery. States have a vital interest in protecting their electoral processes, including the process by which an initiative gets onto the ballot. "Preserving the integrity of the electoral process, preventing corruption, and '[sustaining] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government' are interests of the highest importance." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 788-89 (1978) (citations omitted).

Here, Utah's law is amply supported by the justification that paying circulators per signature is an incentive to commit two types of fraud: 1) submitting false signatures; and 2) misrepresenting the contents of a petition to induce citizens to sign. The by-the-hour compensation requirement combats fraud and the appearance of fraud by removing a direct incentive to unlawfully pad the number of signatures obtained.

Courts agree. In *Pierce*, the Ninth Circuit held that Montana's pay-per-signature restriction "furthers an important state interest in preventing fraud." 44 F.4th at 866. The Ninth Circuit began with noting that the law targets "fraud connected with gatherers paid on a per-signature model." *Id.* at 866. This is because "per-signature payment arrangements encourage . . . fraud." *Id.* The pay-per-signature restriction therefore "rationally reduces the incentive to forge signatures and commit

fraud." *Id.* This Court should also uphold Utah's pay-per-signature restriction. The statute targets fraud and reduces the incentive to submit false signatures.[15]

E.   *Plaintiffs are not likely to succeed on the merits of their claim that a residency requirement is unconstitutional*

1.   Plaintiffs lack standing to assert this claim

In their Initiative application, the Sponsors indicated that they intended to use volunteer circulators only and not paid signature gatherers. *See* Exhibit 4, Initiative application. Plaintiffs further acknowledge in the Complaint that the residency requirement would affect them only insofar as they wished to contract with out-of-state companies that use paid signature gatherers. *See* Pls.' Compl., ECF No. 1, ¶ 24.  Thus, the residency requirement had no effect on the Sponsors' signature gathering campaign, since they chose to use only volunteers. Because the residency requirement did not affect the Sponsors, the Plaintiffs here lack standing to raise a residency requirement claim. "Each plaintiff must have standing to seek each form of relief in each claim." *American Humanist Association, Inc. v. Douglas County School District RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017) (internal quotation and citation omitted). Here, Plaintiff AYLY PAC lacks standing to bring any claim because it was not a sponsor of the Initiative, and Plaintiff Halvorsen lacks standing to bring the claim regarding the residency requirement.

2.   Plaintiffs' allegation that the residency requirement is unconstitutional is moot

Further, the Utah Legislature has repealed the residency requirement. "It is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'" *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). "Throughout the litigation, the party seeking relief must have suffered, or be threatened with, an actual injury traceable to the

---

[15] There is a circuit split on this issue. The Sixth Circuit has disagreed with the Eighth and Ninth Circuits. *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 383 (6th Cir. 2008). To Defendant's knowledge, neither the U.S. Supreme Court nor the Tenth Circuit have ruled directly on the question.

defendant and likely to be redressed by a favorable decision. *Id.* (internal citation omitted). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (internal quotation omitted). "Under the constitutional mootness doctrine, the suit must present a real and substantial controversy with respect to which relief may be fashioned." *Jordan v. Sosa*, 654 F.3d 1012, 1023-24 (10th Cir. 2011). "Constitutional mootness is grounded in the requirement that any case or dispute that is presented to a federal court be definite, concrete, and *amenable to specific relief*." *Id.* (emphasis in original) (internal citation omitted).

Notably for this case, "[w]here a plaintiff seeks an injunction, his susceptibility to *continuing* injury is of particular importance – past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief[.]" *Id.* at 1024 (emphasis in original) (internal quotation and citation omitted). "Similarly, in the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was harmed by the defendant." *Id.* at 1025 (internal citation omitted). Without a redressable injury, a declaratory judgment, even for a constitutional question, would constitute an impermissible advisory opinion. "Federal courts are without power to decide questions that cannot affect the rights of *litigants in the case before them*." *Id.* at 1026 (emphasis in original) (internal citation omitted).

With the repeal of the residency requirement, "intervening circumstances" have deprived the Plaintiffs of a "personal stake in the outcome of the lawsuit." *Campbell-Ewald Co.*, 136 S. Ct at 669. *See also Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116–17 (10th Cir. 2010) ("[E]ven when a legislative body has the power to re-enact an ordinance or statute, ordinarily an amendment or repeal of it moots a case challenging the ordinance or statute.") (*Citing Camfield,* 248 F.3d at 1223) ("As a general rule, if a challenged law is repealed or expires, the case becomes moot."); 13C Wright, Miller & Cooper, § 3533.6, at 277 ("Repeal ... likewise moots attacks on a

statute." Here, the ultimate relief Plaintiffs were hoping to achieve – an injunction of the residency requirement – has already been achieved through a legislative process.

        3.   <u>Even if Plaintiffs' claims are not constitutionally moot, they should nevertheless be dismissed upon grounds of prudential mootness</u>

"Even if a case is not constitutionally moot, a court may dismiss a case under the prudential mootness doctrine if the case is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold the relief it has the power to grant." *Jordan*, 654 F.3d at 1024 (internal quotation omitted). "In general, the prudential mootness doctrine only applies where, as here, a plaintiff seeks injunctive or declaratory relief." *Id*. Under the prudential mootness doctrine, the central inquiry is whether "circumstances [have] changed since the beginning of litigation that forestall any occasion for meaningful relief." *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997).

Here, prudence counsels that this Court stay its hand, even if the case were not moot in the constitutional sense. The residency requirement has been repealed by the Utah Legislature. Given the lack of irreparable injury, the lack of standing to bring this claim in particular, and the lack of likelihood of success on all other claims, little purpose would be served in reviewing the residency requirements on the merits.

      F.   *Plaintiffs are not likely to succeed on the merits of their claim that the packet retrieval prohibition is unconstitutional*

Plaintiffs complain that the packet retrieval prohibition of Utah Code § 20A-7-105(10) is unconstitutional. However, the packet retrieval prohibition serves important government interests by reducing instances of fraud. In this very case, the Davis County Attorney is at least two circulators for fraud for what appears to be blatant alterations of the dates on signature lines. Retrieval of packets by sponsors increases the chances that circulators or sponsors would attempt to alter the packet *ex post facto* and resubmit.

Further, the prohibition on packet retrieval is not a severe burden. The counties post the names of persons whose signatures have been verified. Anyone who has signed a petition may check to see if his or her signature has been verified. It is not necessary for sponsors to retrieve packets to determine whether a signature has been verified or not.

G. *Plaintiffs are not likely to succeed on their claims that the formatting of the signature pages is unconstitutional*

The formatting of the signature pages, as set forth in Utah Code § 20A-7-203(3), serves legitimate and important government interests by creating instructions, warnings, and information for the voter that is clear and legible. It also creates signature lines that encourage clear and legible signing, dating and other identifying information, which assists the county clerks in verifying signatures.

The format of the signature pages does not impose a severe burden on Plaintiffs' First Amendment Free Speech rights. And any *de minimus* burden is justified by the State's legitimate interests under the *Anderson-Burdick* test.

H. *Plaintiffs are not likely to succeed on the merits of their claim that the prohibition on signing an initiative petition more than once is unconstitutional*

The State has a compelling government interest, let alone an important or legitimate one, in preventing people from signing petitions more than once. The requirement, found in Utah Code § 20A-7-213(1)(b), helps prevent fraud and ensures that the initiative has a modicum of support before it goes on the ballot. And it is not a severe burden on anyone to sign a petition only once. This requirement easily passes constitutional muster under the *Anderson-Burdick* test.

I. *Plaintiffs are not likely to succeed on the merits of their claim that the warning against criminal behavior on the signature page is unconstitutional*

The State has a compelling interest in preventing criminal behavior with respect to elections. Warning voters against engaging in criminal behavior serves that interest. And it is not a severe or undue burden on anyone's speech rights to read a warning against criminal behavior. To the contrary, warning citizens of the confines of criminal behavior is often a necessary component of due process. Thus, Utah Code § 20A-7-203(3)(f)(iv) is not unconstitutional.

J. *The provisions of which Plaintiffs complain do not violate the Utah Constitution*

The Court should decline to exercise jurisdiction over Plaintiffs' state claims because they raise novel issues of state law and Plaintiffs have not provided sufficient briefing to assist the Court in resolving them anyway. If the Court does review them, the name of the test Utah uses to review whether laws violate Article VI, Section 1 is not "*Anderson-Burdick*," (which are federal cases); rather, it is an undue burden text. *See* Part II.A.3 herein. For reasons set forth with respect to Plaintiffs' federal constitutional claims, the provisions of the Election Code of which Plaintiffs complain also do not violate the state Constitution because they do not pose an undue burden on Plaintiffs' right to initiate legislation.

## III. The public interest would be harmed by granting the Motion for Preliminary Injunction

"As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos is to accompany the democratic process." *Storer*, 415 U.S.at 730. The Purcell Principle counsels against the granting of the requested injunction. The elections of 2024 are well underway. Postponing deadlines after they have passed would upset the entire election calendar for the Lieutenant Governor's Office, county clerks, and others who are charged with administering the elections. Moving deadlines for this initiative (and, presumably, all other future initiatives) would cause the work given to county clerks to funnel into short time

periods. Such action would increase their administrative burden and introduce an element of uncertainty into the election.

## IV.    Balancing of the harms

"[W]hen the government is the opposing party" in a preliminary injunction motion, the factors of "assessing the harm to the opposing party and weighing the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The harm to the Defendant is effectively harm to the public, as set forth in Part III. And because laches bars a finding of irreparable harm to the Plaintiffs, the balancing of harms clearly favors the Lieutenant Governor and elections officer statewide. Even without the doctrine of laches, the Purcell Principle is itself a weighing of harms, with the scales tipping in favor of the State.

## <u>CONCLUSION</u>

The Court need not reach the likelihood of success on the merits analysis because it would be well within its equitable power to deny the motion based on laches. But if it does examine the merits, then it should be mindful that under the guiding principles of *Storer*, *Anderson*, *Burdick*, *Purcell*, and their progeny, federal courts ought not to second-guess reasonable, non-discriminatory regulations of state-created initiative procedures, such as font size and margins of signature sheets, how many signatures go on a sheet, whether the signature sheet contains warnings against criminal behaviors, etc. The only regulations that merit increased scrutiny from federal courts are ones that severely burden an individual's speech and association rights under the First Amendment. The regulations of which Plaintiffs complain do no such thing. They also do not pose undue burdens on Plaintiffs" state right to initiative legislation. The Court should deny the Motion.

DATED: February 23, 2024

OFFICE OF THE UTAH ATTORNEY GENERAL

*/s/ Lance Sorenson*
DAVID WOLF
LANCE SORENSON
JASON DUPREE
Assistant Utah Attorneys General
*Counsel for Defendant Lt. Governor Henderson*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2024, I electronically filed the foregoing, **DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** by using the Court's electronic filing system which will send a notice of electronic filing to the following:

Kyle F. Reeder
Cannon Law Group
kyle@cannonlawgroup.com

Benjamin Barr
Stephen R. Klein
Barr & Klein PLLC
ben@barrklein.com
steve@barrklein.com

*Counsel for Plaintiffs*

/s/ *Seth Huxford*
Seth Huxford

32