IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **ARE YOU LISTENING YET PAC** and **TRACIE HALVORSEN**,<br><br>                    Plaintiffs,<br>v.<br><br>**DEIDRE HENDERSON**, Lieutenant Governor of the State of Utah, in her official capacity,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR EXPEDITED PRELIMINARY INJUNCTION**<br><br>Case No. 2:24-CV-00104-JNP<br><br>District Judge Jill N. Parrish |

In 2023, the Utah Legislature adopted a new state flag and designated the prior flag as the state's official "historic state flag." Utah Code Ann. §§ 63G-1-501 and 63G-1-503(1). In response, the Are You Listening Yet PAC ("PAC") and Tracie Halvorsen ("Ms. Halvorsen") (collectively "Plaintiffs") submitted an application to present the Restoring the Utah State Flag initiative (the "Initiative") to Utah voters, hoping to thereby restore the prior state flag. But Plaintiffs did not gather enough signatures for their Initiative to qualify for the ballot. Now, Plaintiffs seek an expedited preliminary injunction from this court, declaring several provisions related to the initiative process violative of the First Amendment to the United States Constitution and providing Plaintiffs additional time to gather signatures in support of their Initiative. Defendant Deidre Henderson (the "State," the "Lieutenant Governor," or "Defendant"), opposes Plaintiffs' motion. For the reasons set forth herein, Plaintiffs' motion is **DENIED**.

**FINDINGS OF FACT**

***The Utah State Flag***

1.  For over one hundred years, the Utah state flag has prominently featured the Seal of Utah

in its design. ECF No. 1, ¶ 9.

2. In 2023, the Utah Legislature enacted S.B. 31, State Flag Amendments, codified in Utah Code § 63G-1-501 *et seq.* ECF No. 26-1, ¶ 3.

3. S.B. 31 established a new state flag of Utah and designated the prior flag as the state's official "historic state flag." ECF No. 26-1, ¶ 4. S.B. 31 took effect on March 9, 2024.

4. The Utah Legislature's adoption of a new state flag garnered signature public attention and debate in the Spring of 2023.

### The Parties

5. The PAC is a political action committee formed under the Utah Election Code that raises contributions and expends money in support of the Initiative, including by financing the printing of petition packets. ECF No. 1, ¶ 3.

6. Ms. Halvorsen is the main sponsor of the Initiative, the PAC's primary officer, and a resident of Riverton, Utah. ECF No. 1, ¶ 4.

7. The Lieutenant Governor is charged with the responsibility to "enforce compliance by election officers with all legal requirements relating to elections, including . . . all . . . applicable provisions of federal law and rule relating to elections[.]" Utah Code § 20A-1-105(1)(c)(iii).

### The Initiative

8. Ms. Halvorsen and the PAC "share a deep concern" that the State Legislature's adoption of S.B. 31 is "really [an] effort[] to erase history and eliminate symbols of shared values in civil society." ECF No. 1, ¶ 10.

9. Due to their concerns regarding S.B. 31, Ms. Halvorsen and others filed an application with the Lieutenant Governor's Office on May 2, 2023 to sponsor the Initiative, which would

repeal S.B. 31, provide for one Utah flag, provide that all future adoptions of a new state flag must be submitted to the voters of the state, and provide that all future modification of the state flag and expenditures made in modifying the state flag be submitted to the voters. ECF No. 26-1, ¶ 1.

10. The Lieutenant Governor's Office approved the signature packets for the Initiative on June 12, 2024, upon which date Plaintiffs could begin gathering signatures. ECF Nos. 1, ¶ 12; 1-1, at 2.

11. Pursuant to Utah Code § 20A-7-105(5)(a)(i)(C), the Initiative's sponsors had a February 15, 2024 deadline to submit signatures in an amount equal to 8% of the number of active voters in the state as of January 1, 2023 and equal to 8% of the number of active voters in at least 26 Utah State Senate Districts as of the same date. *Id.*, ¶ 12.

12. On February 15, 2024, the Initiative's sponsors had submitted 99,125 total signatures, 13,110 of which were determined to be invalid under Utah Code § 20A-1-1002. *Id.*

13. The Initiative's sponsors fell over 50,000 signatures short of the number required to qualify to place the Initiative on the 2024 General Election ballot. *Id.*

14. Despite falling short of their signature gathering requirement, Ms. Halvorsen and other sponsors of the Initiative "would like to continue" their signature gathering efforts "into the spring and summer when the weather is more hospitable and when more people are out in public." ECF No. 1, ¶ 21.

15. In continuing their signature gathering efforts, Ms. Halvorsen and the other sponsors of the Initiative "would engage with professional signature gatherers that charge per valid signature collected or at a fixed price[,]" including some "professional signature gatherers who are not residents of Utah." ECF No. 1, ¶¶ 23–24.

16. The Initiative sponsors have neither paid a petition circulator in a manner violative of the Utah Code nor alleged that they would have done so prior to the February 15 deadline if such conduct had not been prohibited.

17. The Initiative sponsors have neither received petition circulation services from any individuals who were not residents of the State of Utah nor alleged that they would have done so prior to the February 15 deadline if such conduct had not been prohibited in the Utah Code.

***The State of Utah's Election Administration Process***

18. Plaintiffs sought ballot access for the General Election that will be held on November 5, 2024.

19. In order to meet its obligations under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), the State is required to finalize ballots for the November 2024 elections at least 5 days prior to the election date. 52 U.S.C. § 20302(a)(8)(A).

20. The State works with third-party vendors who assist in the ballot production and distribution process. The State's contracts with these vendors require the State to finalize ballots a month prior to the deadline set in UOCAVA. The State must therefore finalize ballots by no later than August 2024.

21. The State believes that it is necessary to make initial determination regarding ballot access at least four months prior to its August deadline for finalizing ballots in order to provide adequate time for legal challenges to be brought against those ballot access determinations.

22. In the summer prior to an election, the Utah Code requires the Lieutenant Governor to draft a short title and summary of the Initiative by June 27, while providing the initiative sponsor

an opportunity to object to that summary by July 6, prior to the Lieutenant Governor's certification of the short title and summary to the state's county clerks and prior to the printing of any ballots. Utah Code § 20A-7-209.

23. The Utah Code also requires the Lieutenant Governor to compile a voter information pamphlet in anticipation of an election to inform citizens about issues on the ballot. Utah Code § 20A-7-702.5.

***Plaintiffs' Claims and Requested Relief***

24. Plaintiffs challenge nine provisions of the Utah Code and seek injunctive relief with respect to a tenth statutory provision.

25. Plaintiffs challenge three statutory deadlines for initiatives.

26. First, Plaintiffs challenge Utah Code § 20A-7-105(5)(a)(i)(C) (the "February 15 Deadline Provision"), which requires signature gathering to end by no later than "the February 15 immediately before the next regular general election[.]"

27. Plaintiffs request an injunction excepting the February 15 Deadline Provision and extending the deadline for the Initiative to July 8, 2024 and a declaration that the February 15 Deadline Provision is unconstitutional.

28. Second, Plaintiffs challenge Utah Code § 20A-7-105(5)(a)(i)(A) (the "30-Day Deadline Provision"), which requires an initiative's sponsors to submit each signed and verified signature packet to the local county clerk by no later than "30 days after the day on which the first individual signs the initiative packet[.]"

29. Plaintiffs request a preliminary injunction against the enforcement of the 30-Day Deadline Provision, an order to the State to order all county clerks to accept valid signatures on packets submitted after the 30-Day Deadline Provision's termination but before July 8,

2024, a declaration that the 30-Day Deadline Provision is unconstitutional, and an order directing the State to order all county clerks to review already rejected Initiative signature packets to accept any signatures rejected as a result of the 30-Day Deadline Provision.

30. Third, Plaintiffs challenge Utah Code § 20A-7-105(5)(a)(i)(B) (the "316-Day Deadline Provision"), which establishes that signature gathering may not continue for more than "316 days after the day on which the application for the initiative petition is filed[,]" except that an initiative's sponsors cannot gather signatures for the full 316 days if that period would extend beyond the deadline established by the February 15 Deadline Provision.

31. Plaintiffs request an injunction against the enforcement of the 316-Day Deadline Provision, a declaration that the 316-Day Deadline Provision is unconstitutional, and an order directing the State to order all county clerks to review Initiative signatures packets submitted between the 316-Day Deadline Provision's March 13, 2024 cutoff and July 8, 2024.

32. Plaintiffs challenge two statutory provisions that establish formatting requirements for initiative signature packets.

33. First, Plaintiffs challenge Utah Code § 20A-7-203(3) (the "Two Signatures Per Page Provision"), which requires initiative packets to be formatted to accommodate exactly two signatures per page in each signature packet.

34. Plaintiffs request a preliminary injunction against the use of initiative signature packet sheets complying with the Two Signatures Per Page Provision, a declaration that the Two Signatures Per Page provision is unconstitutional, and an order directing the State to approve a signature page for Initiative packets that can accommodate 10 signatures per page by no later than March 1, 2024.

35. Second, Plaintiffs challenge Utah Code § 20A-7-203(3)(f)(iv) (the "Misdemeanor Warning Provision"), which requires initiative signature packets to contain a warning on each page that it is a misdemeanor to "knowingly sign the individual's name more than once for the same measure[.]"

36. Plaintiffs request a preliminary injunction permitting Plaintiffs to add "if the individual's previous signature has not been rejected" following the challenged language found in the Misdemeanor Warning Provision and an order directing the State to order all county clerks to consider the amended signature pages valid when assessing submitted signatures.

37. Plaintiffs challenge two regulations that establish requirements for petition circulators.

38. First, Plaintiffs challenge Utah Code § 20A-7-104(1)–(3) (the "Circulator Pay Provision"), which establishes that petition circulators may be compensated only through an hourly pay rate and not on a per-signature or related basis.

39. Plaintiffs request a preliminary injunction against the State's enforcement of the Circulator Pay Provision.

40. Second, Plaintiffs challenge Utah Code § 20A-7-105(4)(a)(i) (the "Circulator Residency Provision"), which requires circulators to be residents of the State of Utah.

41. Plaintiffs request a preliminary injunction against the State's enforcement of the Circulator Residency Provision.

42. The Utah Legislature recently adopted S.B. 107, Election Process Amendments, which repealed the Circulator Pay Provision. S.B. 107 took effect on February 28, 2024 when the Governor signed the bill.

43. Plaintiffs challenge Utah Code § 20A-7-213(1)(b) (the "Misdemeanor Provision"), which states that it is a misdemeanor to knowingly sign an initiative petition more than once.

44. Plaintiffs request a preliminary injunction against the enforcement of the Misdemeanor Provision as applied to Initiative signers whose previous signature was rejected and a declaration that the Misdemeanor Provision is unconstitutional.

45. Plaintiffs challenge Utah Code § 20A-7-105(10) (the "Packet Retrieval Provision"), which prohibits initiative sponsors from retrieving packets that were wholly rejected.

46. Plaintiffs seek a preliminary injunction against the enforcement of the Packet Retrieval Provision as applied to wholly rejected Initiative packets, a declaration that the Packet Retrieval Provision is unconstitutional, and an order directing the State to order all county clerks to return wholly rejected Initiative packets to the Initiative sponsors.

47. Plaintiffs final claim relates to Utah Code § 20A-7-203(3) (the "Accepted Signatures Disclosure Provision"), which provides for public reporting of accepted initiative signatures.

48. Plaintiffs do not contest the Accepted Signatures Disclosure Provision's validity but request injunctive relief consisting of an order directing the State to order all county clerks to also publicly report the names of all *rejected* signatures (or to provide the names of all rejected signatures to the circulator who gathered that signature).

**LEGAL STANDARD**

To obtain a preliminary injunction, the Plaintiffs must establish the following four elements: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (internal quotation and citation omitted). "[A] preliminary injunction is an

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (citation omitted); *accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.") (citation omitted).

Preliminary injunctions that "alter the status quo," "mandatory preliminary injunctions," and "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits" are disfavored. *See Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)). In such cases, the movants must "make[] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* at 724 (quoting *Beltronics USA Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009)). This heightened standard applies because Plaintiffs seek a mandatory preliminary injunction in the form of an order affirmatively directing the State to act. *See, e.g.,* ECF No. 2, at 3–5.

**ANALYSIS**

Plaintiffs seek expedited injunctive and declaratory relief with respect to ten statutory provisions that affect the process by which Utah citizens may petition to change state laws through the initiative process. Plaintiffs have failed to demonstrate that they would suffer irreparable harm absent preliminary injunctive relief. This fact alone is sufficient to compel the court to deny Plaintiffs' motion. But Plaintiffs' motion also suffers from other faults. Plaintiffs lack standing to bring two of their claims and a third claim alleged in Plaintiffs' complaint is moot. As a result, the court only possesses jurisdiction to consider seven of Plaintiffs' ten claims. Moreover, Plaintiffs are not likely to succeed on the merits of any of their seven remaining claims. As a result, the court

denies Plaintiffs' motion for the reasons set forth below.

## I.   JUSTICIABILITY

The court must assure itself of its subject matter jurisdiction in every case. *See Citizens Concerned for Separation of Church & State v. City & County of Denver*, 628 F.2d 1289, 1297, 1301 (10th Cir. 1980). The same is true even when doing so requires *sua sponte* action. *See Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995) ("[I]f the parties fail to raise the question of the existence of jurisdiction, the federal court has the duty to raise and resolve the matter."); *see also Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005) ("Simply put, once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue."). Justiciability doctrines, including standing and mootness, are among those jurisdictional prerequisites of which the court must assure itself before reaching the merits in any matter. *See Powder River Basin Resource Council*, 54 F.3d at 1485 ("Standing is a limitation on a court's jurisdiction."). Considering these doctrines, the court finds that Plaintiffs lack standing to bring some of their claims. Another of Plaintiffs' claims was mooted by the Utah Legislature's recent repeal of one provision that Plaintiffs challenge. These jurisdictional bars prevent the court from granting relief on three of the Plaintiffs' ten claims.

### A.   STANDING

#### i.   *Legal Standard*

Federal courts may only exercise the judicial power in "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. Constitutional standing determines which disputes fall within those justiciable categories. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). To possess standing to sue, a plaintiff must have suffered an injury in fact, caused by the defendant's conduct, which is

redressable through one or more stated claims. *Citizen Ctr. v. Gessler*, 770 F.3d 900, 909 (10th Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-01, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)); *see also Simon v. Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 38 (1976) (holding that a plaintiff's satisfaction of standing's three elements thereby demonstrates the plaintiff has "such a personal stake in the outcome of the controversy as to . . . justify [the] exercise of the court's remedial powers on [his or her] behalf") (internal quotation marks omitted).

An "injury in fact" is a detriment to a legal interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical. *D.L. v. Unified Sch. Dist. No. 497*, 596 F.3d 768, 774 (10th Cir. 2010) (citing *Stewart v. Kempthorne*, 554 F.3d 1245, 1253 (10th Cir. 2009)). Ordinarily, wishes—like "some day" intentions—"do not support a finding of the 'actual or imminent' injury" that standing requires. *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 874–75 (10th Cir. 2020) (quoting *Lujan*, 504 U.S. at 564). In the First Amendment context, however, a plaintiff does not need to demonstrate "specific plans" to take actions subject to a challenged statute. *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1088–89 (10th Cir. 2006) (en banc). Instead, a First Amendment plaintiff generally has standing to bring a pre-enforcement challenge to a statute if he or she "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003) (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)). Alternatively, a plaintiff who "faces a credible threat of future prosecution suffers from an 'ongoing injury resulting from the statute's *chilling effect* on his desire to exercise his First Amendment rights.'" *Id.* (quoting *Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987)) (emphasis in original). To establish standing on this latter basis, a First Amendment plaintiff must show (1) evidence that in the past he or she engaged in the type

of speech or conduct affected by the challenged government action, (2) evidence that the plaintiff has a present desire, though no specific plans, to engage in such speech or conduct; and (3) a plausible claim that the plaintiff has no intention to engage in such speech or conduct because of a credible threat that the law will be enforced. *Peck v. McCann*, 43 F.4th 1116, 1129-31 (10th Cir. 2022) (quoting *Walker*, 450 F.3d at 1088–89).

A plaintiff who has demonstrated an injury in fact must still show that the injury was caused by the defendant's conduct and redressable by a favorable ruling from the court. "The principle of causation for Article III standing requires a plaintiff's injury to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Colorado v. United States EPA*, 989 F.3d 874, 889 (10th Cir. 2021) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007)). Redressability requires the plaintiff to demonstrate that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Kempthorne*, 554 F.3d at 1253 (quoting *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1317-18 (10th Cir. 2008)).

"[S]tanding is not dispensed in gross." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)). Instead, "a plaintiff must demonstrate standing for each claim he seeks to press[.]" *Id.*; *see also DaimlerChrysler Corp. v. Cuno*, 57 U.S. 332, 341 (2006) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Thus, a plaintiff who challenges several statutes must show that he or she has standing to challenge each statute individually.

The State raises two challenges to Plaintiffs' alleged injury in fact. First, the State argues that the PAC "lacks standing to bring any claim because it was not a sponsor of the Initiative[.]"[1]

---

[1] The State provides no explanation as to why this fact alone would prevent the PAC from possessing standing to sue when it has nonetheless alleged a desire to engage in First Amendment speech in support of the Initiative. The court

ECF No. 26, at 30. The State also argues that Plaintiffs do not possess standing to challenge the Circulator Pay Provision because they have not paid a circulator and lack concrete plans to do so.[2] For the reasons set forth below, the court determines that Plaintiffs lack standing to challenge either the Circulator Pay Provision or the Misdemeanor Provision.

### ii.    *Circulator Pay Provision*

To establish standing to challenge the Circulator Pay Provision, Plaintiffs were required to "allege[] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Ward*, 321 F.3d at 1267 (citation omitted). Plaintiffs' factual allegations do not clear this bar.

Prior to the Initiative's February 15 deadline, Plaintiffs never planned or attempted to pay petition circulators. *See* ECF No. 1, ¶ 23. In fact, Plaintiffs' allegations are devoid of any mention that Plaintiffs even *desired* to pay petition circulators prior to February 15, 2024, or that they would have so desired had the Circulator Pay Provision not been in effect. Instead, Plaintiffs allege only a future intent, claiming that they "wish to use a blend of volunteer signature gatherers (now) along with paid gatherers once the weather becomes better." ECF No. 2, at 19. For two reasons, this allegation is insufficient to demonstrate that there "exists a credible threat of prosecution" if Plaintiffs engage in their desired course of conduct. First, Plaintiffs allege that they "would engage with professional signature gatherers that charge per valid signature collected *or at a fixed price*." ECF No. 1, ¶ 23 (emphasis added). Utah Code § 20A-7-104(1) prohibits initiative sponsors from paying circulators "based on a rate per signature, on a rate per verified signature, or on the initiative

---

therefore dismisses this argument, finding that it is unsupported and would not affect the court's ultimate ruling on Plaintiffs' motion.

[2] The State presents a very similar argument with respect to Plaintiffs' claim challenging the Circulator Residency Provision. As addressed in the following section, however, that claim is moot. The court therefore does not address Plaintiffs' standing to challenge that provision in this subsection.

. . . qualifying for the ballot." Plaintiffs have not alleged anything but a speculative possibility that they would compensate petition circulators in a prohibited manner (as opposed to compensating petition circulators at a fixed price). But even if Plaintiffs specifically alleged that they would pay petition circulators on a per-signature basis in violation of the Circulator Pay Provision, Plaintiffs' counsel conceded at oral argument that Plaintiffs had produced no evidence upon which the court could find that the Plaintiffs had the resources to fundraise and pay petition circulators. This further factual issue would require the court to address the question of whether Plaintiffs' alleged harm is actual or imminent as opposed to merely speculative. As a result, Plaintiffs clearly lack a "credible threat of prosecution" sufficient to demonstrate an injury in fact.

Plaintiffs lack standing to challenge the Circulator Pay Provision for a second reason: their alleged injury was not caused by the Lieutenant Governor's conduct and would therefore not be redressable by a favorable ruling from this court. *See Bronson*, 500 F.3d at 1110 (quoting *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998) ("In a suit such as this one, where the plaintiff seeks a declaration of the unconstitutionality of a state statute and an injunction against its enforcement, a state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with enforcement of the provision at issue.")). The Circulator Pay Provision appears to be enforceable only by a statutory provision establishing that a violation of that provision is a class B misdemeanor. *See* Utah Code § 20A-7-104(7) ("A person who violates this section is guilty of a class B misdemeanor."). But the Lieutenant Governor's state office does not confer upon her the authority to enforce this criminal statute. *Cf.* Utah Const. art. VIII, § 16 (public prosecutors have "primary" authority for prosecution of criminal actions); Utah Code Ann. § 10-3-928 (authorizing city attorney to prosecute certain crimes). As a result, Plaintiffs' alleged injury was not caused by the Lieutenant Governor's threatened enforcement of the provision, and because

she is the only state officer named as a defendant in this suit, a favorable ruling enjoining her enforcement of the law would not redress Plaintiffs' alleged injury. The same is all the more true because Plaintiffs do not seek a declaratory judgment that the Circulator Pay Provision is unconstitutional; they request only a preliminary injunction preventing the *Lieutenant Governor* from enforcing that provision. *See Bronson*, 500 F.3d at 1112 (concluding that a plaintiff lacked redressability when "[e]njoining *this defendant* . . . would be a meaningless gesture"). As a result, Plaintiffs lack standing to challenge the Circulator Pay Provision and the court lacks jurisdiction to grant relief with respect to this claim.

### iii.  *Misdemeanor Provision*

The Plaintiffs also lack standing to challenge the Misdemeanor Provision, which is enforceable only by a state actor bringing criminal charges. *See* Utah Code §§ 20A-7-213(1)(b)– (e) and (4). As discussed above, the Lieutenant Governor is not the state officer charged with enforcing the State of Utah's criminal laws. Any threat of this provision's enforcement, then, cannot have been caused by the Lieutenant Governor's conduct, and a favorable judicial ruling could not redress Plaintiffs' alleged injury because she is the only named defendant in this suit. For the same reason articulated above with respect to the Circulator Pay Provision, Plaintiffs also lack standing to challenge the Misdemeanor Provision.

### B.  MOOTNESS

### i.  *Legal Standard*

Mootness complements standing by ensuring that a "genuine, live dispute between adverse parties" exists at all stages of a case, thereby preventing the court from issuing an advisory opinion as to a litigant who possesses standing. *See Carney v. Adams*, 141 S. Ct. 493, 498 (2020); *Genesis Healthcare Corp v. Symczyk*, 569 U.S. 66, 71–72 (2013). Generally, the "defendant . . . has the

'stringent' burden of persuasion on mootness by showing that 'subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1165 (10th Cir. 2023) (quoting *Friends of the Earth v. Laidlaw*, 528 U.S. at 189). The "crucial question" is whether granting relief "will have some effect in the real world." *Id.* (quoting *Kan. Jud. Rev. v. Stout*, 562 F.3d 1240, 1246 (10th Cir. 2009)). When a plaintiff's alleged injury is no longer redressable through a judicial decision, "a live controversy ceases to exist, and the case becomes moot." *Id.* (citing *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015)).

### ii.    *Plaintiffs' Challenge to the Circulator Residency Provision is Moot*

On February 22, 2024, the Utah Legislature adopted S.B. 107, Election Process Amendments. ECF No. 1, ¶ 9. The bill repeals the Circulator Residency Provision entirely. S.B. 107 took effect when the Governor signed it into law on February 28, 2024. As a result, it is "absolutely clear" that Plaintiffs' alleged harm caused by the threat of the State's enforcement of the Circulator Residency Provision "could not reasonably be expected to recur." *Oliver*, 57 F.4th at 1165. Perhaps Plaintiffs could have alleged that they were prevented from using nonresident petition circulators while the Circulator Residency Provision was in effect or that their speech was otherwise chilled by the threat of the provision's enforcement. But the court finds no such allegation in Plaintiffs' verified complaint or the present motion, and at oral argument, Plaintiffs' counsel confirmed that no such allegation had been made. The State has therefore met its burden to demonstrate that Plaintiffs' claim challenging the Circulator Residency Provision is moot. As a result, the court lacks jurisdiction to resolve Plaintiffs' claim challenging this provision.

### C.    CONCLUSION

For the reasons set out within this section, three of Plaintiffs' claims lack justiciability and

therefore cannot provide a basis for preliminary injunctive relief. Plaintiffs' challenge to the Circulator Residency Provision was mooted by the State Legislature's adoption of S.B. 107, which the Governor signed into law on February 28, 2024. Plaintiffs also lack standing to challenge the Misdemeanor Provision, which fails on the causation and redressability prongs of standing analysis, as well as the Circulator Pay Provision, for which Plaintiffs have neither adequately alleged an injury in fact nor facts upon which to find that the Lieutenant Governor caused Plaintiffs' alleged injury such that a favorable judicial determination would redress such an injury. The court consequently lacks jurisdiction to provide Plaintiffs' equitable relief with respect to any of these three claims.

Having ensured itself of its subject matter jurisdiction over Plaintiffs' seven remaining claims, the court now reaches the four elements that it must consider in determining whether to grant Plaintiffs expedited preliminary injunctive relief on any of these claims. The court declines to grant any such relief because Plaintiffs have neither shown that they would suffer irreparable harm absent preliminary injunctive relief nor that they are likely to succeed on the merits of their First Amendment claims.

## II.    IRREPARABLE HARM

### A.    LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must establish that he or she is "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter v. Nat'l Resources Defense Council*, 555 U.S. 7, 20 (2008) (citation omitted). Irreparable harm must be *likely* absent a preliminary injunction because the movant must show a clear entitlement to such extraordinary relief. *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably

17

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Courts therefore presume irreparable harm when a plaintiff has demonstrated a likelihood of success on the merits on a First Amendment claim. *See, e.g., Summum v. Pleasant Grove City*, 483 F.3d 1044, 1055-56 (10th Cir. 2007), *rev'd on other grounds*, 555 U.S. 460 (2009); *see also Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 2016 U.S. Dist. LEXIS 2746, at *11–12 (W.D. Okla. Jan. 11, 2016). Moreover, because the election "will only be held once[,]" First Amendment injuries related to ballot access generally demonstrate irreparable harm. *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1259 (D. Utah 2017); *Citizens United*, 558 U.S. 310, 334 (2010).

The presumption of irreparable harm may be undermined, however, by a plaintiff's delay in seeking an injunction. *See, e.g., Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1220–21 (D. Utah 2004) (finding that plaintiffs' six month delay in seeking a preliminary injunction "belies any irreparable injury" to their First Amendment rights); *see also Kansas Health Care Ass'n v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) ("As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury."); 11A Wright & Miller, Federal Practice and Procedure § 2946 at pp. 113-14 (1995). "[D]elay is only one factor to be considered[,]" however, "and there is no categorical rule that delay bars the issuance of an injunction." *Fish*, 840 F.3d at 753. The court should therefore consider three factors in determining whether a plaintiff's delay in vindicating its own rights undermines that party's irreparable harm argument: "whether the delay was reasonable, was not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party." *Id.* (quoting *RoDa Drilling*, 552 F.3d at 1211).[3]

---

[3] The State notes that this test mirrors the test for laches, which considers two factors: a lack of diligence in asserting claims and prejudice to the party defending against the claim. Importantly, "constitutional claims are not immune from the reach of laches[.]" *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1302 (10th Cir. 2012) (internal citation omitted).

### B. DISCUSSION

Plaintiffs support their motion for a preliminary injunction by contending that if the court were to find that Plaintiffs were likely to succeed on their First Amendment claims, they would be "entitled to a presumption of irreparable injury." ECF No. 2, at 22 (quoting *Garbett*, 458 F.Supp.3d at 1250). Moreover, the upcoming election "will only be held once," making issues related to ballot access irreparable. *Id.* (citing *United Utah Party Cox*, 268 F. Supp. 3d 1227, 1259 (D. Utah 2017); see also *Citizens United*, 558 U.S. at 334). Plaintiffs could run the same initiative in the future, but they would be required to wait four years before doing so. *See* Utah Code Ann. § 20A-7-202(5)(a)(v).

Plaintiffs submitted their Initiative application on May 2, 2023 and began gathering signatures in support of the Initiative the following month. ECF Nos. 1, ¶ 12; 1-1, at 2. At the outset, Plaintiffs knew or had the opportunity to learn of all the applicable statutory regulations of the initiative process.[4] Nonetheless, Plaintiffs waited until February 8, 2024, one week prior to the signature gathering deadline, to seek preliminary injunctive relief against the laws that they insist violate their First Amendment rights by regulating the initiative process. *See* ECF Nos. 1–2. Even if Plaintiffs were likely to prevail on the merits of their First Amendment claims, their unnecessary and unexplained delay in seeking equitable relief undermines their claim that they will suffer irreparable harm but for expedited preliminary injunctive relief. But because "delay is only one

---

[4] At oral argument, Plaintiffs' counsel argued that one justification for Plaintiffs' delay in bringing their suit was that at the outset of their efforts to gather signatures in support of their Initiative, Plaintiffs were not aware of either some or all of the applicable regulations that they now challenge. This contention seems to bely the long-standing proposition that "everyone is presumed to know the law and is bound to take notice of it." *See, e.g., Demarco v. Lapay*, No. 2:09-CV-190-TS, 2009 U.S. Dist. LEXIS 107282, *30 (D. Utah Nov. 17, 2009) (citing *U.S. to Use of Hine v. Morse*, 218 U.S. 493, 510 (1910); 37 Am. Jur. 2d Fraud and Deceit §§ 97-98 (2001)). This conclusion is not altered by the fact that Plaintiffs are a small grassroots political organization. The court therefore places no weight on Plaintiffs' contention that they are excused for their delaying in vindicating their rights merely because they allegedly failed to take the opportunity to learn of the applicable regulations prior to sponsoring a ballot initiative effort.

factor to be considered[,]" the court considers whether Plaintiffs' delay was reasonable, was not a decision to "sit on their rights," and did not prejudice the State. *Fish*, 840 F.3d at 753.

Plaintiffs have not established any basis upon which the court could find that their delay in seeking expedited preliminary injunctive relief was reasonable. At oral argument, Plaintiffs claimed that their delay was caused by their initial lack of knowledge regarding the initiative process's regulations and their need to raise funds to retain counsel to mount an attack on the challenged statutory provisions. But Plaintiffs have failed to explain why it was reasonable to expend months of effort gathering signatures in support of the Initiative before Plaintiffs had apprised themselves of the relevant regulations or raised claims challenging those initiative regulations that they believe to be violative of the First Amendment.

Moreover, the court is persuaded by the State's argument that the Plaintiffs decided to "sit on their rights" by engaging in the signature gathering process until one week prior to the signature gathering deadline. Nothing in the record suggests that Plaintiffs' delay in bringing the present suit was caused by the State or any other actor. Plaintiffs were not precluded from bringing their challenge to Utah's statutes regulating the initiative process by any factor besides their own delay.

Finally, the court finds that the State has demonstrated that it would be prejudiced by an order granting preliminary injunctive relief after Plaintiffs' significant delay in bringing the present suit. Both the Lieutenant Governor and the State of Utah's various county clerks rely upon the statutory framework regulating the initiative process to support the orderly administration of elections. Plaintiffs' motion, which seeks an order from court extending the applicable signature gathering deadlines to July 2024, would significantly disrupt that process and inhibit the State's efforts to comply with its election-related duties and obligations. At oral argument, the State focused in particular on its obligation to submit final ballots to its third-party vendors by the August

prior to an election, the importance of providing for at least a four-month window prior to that August deadline in which parties may bring legal challenges to ballot access determinations, and federal law's mandate that ballots be made available to members of the Uniformed Services outside of the United States pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, which requires the State to issue final ballots to American servicemembers stationed overseas by the September prior to the election. The State also pointed to provisions in the Utah Code that require the Lieutenant Governor to work with the Utah Legislature's Legislative Counsel to draft a short title and summary of the Initiative, while providing the initiative sponsor an opportunity to object to that summary, prior to the printing of any ballots, as well as other provisions that require the Lieutenant Governor to compile a voter information pamphlet for citizens to access around election time.

As a result of the foregoing considerations, the State insists that an order granting Plaintiffs' motion would cause prejudice by inhibiting voters from receiving timely information regarding the election, causing confusion among voters regarding which issues will appear on the ballot, and preventing courts from adequately considering later ballot access challenges. The court agrees. If Plaintiffs had brought this suit at the outset—or even a few months ago—perhaps the court could have addressed their claims in a timely manner without threatening to disrupt the election process, which is already underway. But Plaintiffs' decision to wait until the week before the signature gathering deadline to seek expedited preliminary injunctive relief foreclosed that possibility. As a result, the court concludes that Plaintiffs have not demonstrated that irreparable harm would follow if the court denied their motion.

A movant cannot obtain preliminary injunctive relief without showing a significant risk of irreparable harm. *Colorado*, 989 F.3d at 890. Because this factor is dispositive to Plaintiffs'

motion, the court "need not consider the other factors" and may deny Plaintiffs' motion solely upon this basis. *Id.* (quoting *New Mexico Dep't of Game & Fish*, 854 F.3d at 1255). Nonetheless, the court proceeds to consider the likelihood of Plaintiffs' success on the merits of their First Amendment claims, concluding that Plaintiffs cannot establish that they are likely to prevail on the merits of any of their justiciable claims.

### III.   LIKELIHOOD OF SUCCESS ON THE MERITS

Even presuming that Plaintiffs demonstrated they would suffer irreparable harm absent preliminary injunctive relief, the court would deny Plaintiffs' motion because they have not adequately shown a likelihood of success on the merits on any of their remaining claims.[5]

#### A.   LEGAL STANDARD

##### i.   *The Right to Initiative Under Utah Law*

The Utah Constitution guarantees its citizens the right to legislate by initiative.[6] Utah Const. Art. VI, § 1. "But that right is a qualified one. The Constitution expressly states that the right is to initiative legislation 'in the numbers, under the conditions, in the manner, and within the time *provided by statute.*'" *Count My Vote, Inc. v. Cox*, 2019 UT 60, ¶ 3, 452 P.3d 1109 (2019) (quoting Utah Const. Art. VI, § 1(2)(a) (emphasis in original); *see also Downs v. Thompson*, 2019 UT 63, ¶ 25 (2019) (discussing that the separation of powers doctrine limits the subject matter of permissible initiatives and referenda to matters that are legislative in nature). Moreover, the Utah Legislature "is *required* to 'enact legislation to enable the people to exercise their reserved power

---

[5] The court does not address Plaintiffs' likelihood of success in challenging either the Circulator Pay Provision or the Misdemeanor Provision, both of which Plaintiffs lack standing to challenge. The court also does not address Plaintiffs' likelihood of success in challenging the Circulator Residency Provision, which was mooted by the Utah Legislature's recent adoption of S.B. 107. The court denies Plaintiffs' motion with respect to each of these claims on the bases of justiciability and the lack of irreparable harm.

[6] As explained below, the court declines to exercise supplemental jurisdiction over Plaintiffs' claims arising under the Utah Constitution. *See* Section V, *infra*.

and right to directly legislate through initiative.'" *Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State*, 2004 UT 32, ¶ 28, 94 P.3d 217 (quoting *Gallivan*, 2002 UT 89, ¶ 28, 54 P.3d 1069) (emphasis added). But "legislative restrictions" on the right of Utah citizens to initiate legislation are subject to "constitutional scrutiny." *See Count My Vote, Inc.*, 2019 UT 60, ¶ 42 (citing *Cook*, 2014 UT 46, 34 P.3d 634). In some cases, state laws impacting the ability of Utah citizens to exercise their right to exercise the legislative power through the initiative process may violate the Utah Constitution. In other cases, the First Amendment to the United States Constitution is also implicated by laws regulating the expressive political conduct of circulating petitions in support of initiative efforts.

### ii. The Supreme Court has Long Recognized that Restrictions on the Initiative Process may Implicate the First Amendment

"[T]he freedom of speech" is "secured by the First Amendment against abridgment by the United States," and is "among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940); *see also East High Gay/Straight Alliance v. Board of Educ.*, 81 F. Supp. 2d 1166, 1169 (D. Utah 1999) ("The First Amendment's guarantee of freedom of expression finds application to the conduct of state and local governments . . . by way of the Due Process Clause of the Fourteenth Amendment.") (citation omitted). As the Court recognized in 1988, the First Amendment's protection of the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people" is necessarily implicated when individuals "seek to petition to achieve political change" through the initiative process. *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). The First Amendment is not implicated where the state deprives citizens of the right to legislate by initiative, but it is implicated where the speech of an initiative sponsor or circulator in support of an initiative is

regulated. *See id.* (concluding that petition circulators' "right freely to engage in discussions concerning the need for that change" that the initiative sponsors seek to effectuate "is guarded by the First Amendment").

In *Meyer v. Grant*, the Court reviewed a Colorado law that prohibited all forms of payment for petition circulators, applying exacting scrutiny and holding the law violative of the Frist Amendment. *Id.* at 420, 428 (citing *Buckley v. Valeo*, 424 U.S. 1, 5 (1976)). The Court also examined Colorado's statute regulating the format of an initiative signature packet, which required each page to bear a warning to "potential signatories that it is a felony to forge a signature on a petition or to sign the petition when not qualified to vote and admonishing signatories not to sign the petition unless they have read and understand the proposed initiative." *Id.* at 427. The Court made no indication that such provisions regulating the process of petitioning for political change by initiative were also subject to exacting scrutiny. Instead, the court pointed to these provisions as emblematic of the fact that Colorado possessed "adequate" tools to "minimize[e] the risk of improper conduct in the circulation of a petition," demonstrating the state's failure to explain why a total prohibition on paid petition circulation was necessary to serve the state's interest in preventing fraud. *Id.* at 427–28 (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978)).

### iii.   *Courts Have Adopted the* Anderson-Burdick *Balancing Test to Determine When State Regulations of the Initiative Process Implicate the First Amendment*

The Court's decision in *Meyer v. Grant* did not fully resolve how lower courts can know when the First Amendment is implicated by a state's regulation of its own initiative process. In later cases, the Court provided further guidance by adopting the *Anderson-Burdick* balancing test, which "established a framework to assess whether election regulations unconstitutionally burden

an individual's First Amendment rights." *See Garbett v. Herbert*, 458 F. Supp. 3d 1328, 1337 (D. Utah 2020) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1980)). Under this test, the court must first weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate[.]" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788–89). Then, the court must consider "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (citations omitted).

Both parties in the present case invoke the *Anderson-Burdick* framework, urging the court to apply either strict scrutiny or rational basis review to each of the challenged statutory provisions based on how those laws burden Plaintiffs' speech rights. In some courts, that would be the correct standard to apply. *See Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2616 (C.J. Roberts, concurring in the grant of a stay) (explaining that the Sixth, Eighth, and Ninth Circuits apply First Amendment scrutiny under the *Anderson-Burdick* framework whenever a "neutral, procedural regulation inhibits a person's ability to place an initiative on the ballot"). But in the Tenth Circuit, courts are obligated to first determine whether a challenged statute regulating the initiative process implicates First Amendment rights at all before reaching the question of which level of scrutiny to apply. *See id.*; *Thompson v. Dewine*, 976 F.3d 610, 615 n.4 (6th Cir. 2020) (discussing the circuit split on this issue).

### iv.     Under Circuit Precedent, Mere Regulations of the Initiative Process do not Implicate the First Amendment Even if They Increase the Cost and Burden of Ballot Access

In the Tenth Circuit, regulations that impact the initiative process do not always implicate the First Amendment, even when they make the initiative process more costly or onerous. *See,*

25

*e.g., Little*, 140 S. Ct. at 2616 (C.J. Roberts, concurring in the grant of a stay). Over time, the Tenth Circuit has provided meaningful guidance on the issue of when initiative process regulations give rise to First Amendment claims.

In 2002, the Tenth Circuit reviewed a challenge to a provision in the Colorado Constitution that provided the power of initiative to home rule counties but not to statutory counties. *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1208 (10th Cir. 2002). The court's analysis turned upon the crucial recognition that the First Amendment provides no protection whatsoever to the right to make law by initiative, which is exclusively a matter of state law. *See id.* ("[T]he right to free speech . . . [is] not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech *associated with* an initiative procedure[.]"). The court therefore found that First Amendment rights were not implicated by the Colorado law that determined only "where the people reserve[d] the initiative or referendum power," without regulating how they exercised their free speech rights in furtherance of their right to initiative under state law. *Id.* (quoting *Stone v. City of Prescott*, 173 F.3d 1172, 1175 (9th Cir. 1999)).

In its *en banc* rehearing of *Initiative & Referendum Institute v. Walker*, the Tenth Circuit provided more clarity as to the bounds of First Amendment protection *vis a vis* state regulations of the initiative process. "The First Amendment undoubtedly protects the political speech that typically attends an initiative campaign," the court wrote, "just as it does speech intended to influence other political decisions." *Walker*, 450 F.3d at 1099 (citing *Meyer*, 486 U.S. at 416). *Meyer v. Grant*, the court further explained, involved the "core political speech" of circulating an initiative petition, which "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.* Laws that "regulate[] the process of advocacy itself[,]" determining "*who* could speak" and "*how* to go about speaking[,]" as the

26

Colorado law prohibiting all forms of paid petition circulation in *Meyer* did, are subject to "exacting scrutiny" under the First Amendment. *Id.* (citing *Meyer*, 486 U.S. at 416; *ACLF*, 120 F.3d at 1100–05). The court then drew a critical distinction between "laws that regulate or restrict the communicative conduct of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the *process* by which legislation is enacted, which do not." *Id.* at 1099–1100 (emphasis added). "[T]here is a crucial difference between a law that has the 'inevitable effect' of reducing speech because it restricts or regulates speech, and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed." *Id.* at 1100 (citing *Riley v. Nat'l Fed. Of Bline, Inc.*, 487 U.S. 781, 790 n.5 (1988); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671–72 (1991); *Ukranian-American Bar Ass'n v. Baker*, 282 U.S. App. D.C. 225, 893 F.2d 1374, 1379 (D.C. Cir. 1990)). In short, the Tenth Circuit concluded, "[t]he First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are equally likely to prevail."[7] *Id.* at 1101.

In later decisions, the Tenth Circuit has reaffirmed its *Walker* decision. "[T]his court has previously addressed and rejected the proposition that the First Amendment is implicated by a state law that makes it more difficult to pass a ballot initiative[,]" the court explained in 2019. *Semple v. Griswold*, 934 F.3d 1134, 1142 (10th Cir. 2019). As a result, a state law that makes the initiative process "more difficult and costly" does not "give rise to a cognizable First Amendment claim" unless that law "regulate[s] or restrict[s] the communicative conduct" of petition circulators. *Semple*, 934 F.3d at 1142 (quoting *Walker*, 450 F.3d at 1099–1100).

---

[7] The Tenth Circuit has applied strict scrutiny to state regulations of the initiative process in narrow circumstances where the "quantum of speech is limited due to restrictions on" (1) "campaign expenditures, as in *Valeo*," (2) "the available pool of circulators or other supporters of a candidate or initiative, as in *ACLF* and *Meyer*," and (3) "the anonymity of such supporters, as in *ACLF*, *Valeo*, and *McIntryre v. Ohio Elections Comm'n*." *See Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000).

**B.      DISCUSSION**

Strict scrutiny does not apply to any of the Plaintiffs' seven remaining First Amendment claims. Most of Plaintiffs' demands for relief fail to state a cognizable First Amendment claim. Those few claims that do implicate First Amendment principles demand only rational basis review. In light of the applicable standard of review, Plaintiffs cannot demonstrate that they are likely to succeed on the merits of any remaining First Amendment claim.

### *i.      Deadlines*

First, Plaintiffs challenge three deadlines applicable to ballot access for initiatives: the 316-Day Deadline Provision, the 30-Day Deadline Provision, and the February 15 Deadline Provision. Plaintiffs insist that these three deadlines are "baseless" and "unreasonably restrictive" on initiative sponsors who wish to gather signatures on their initiatives closer to the election date. Despite Plaintiffs' reliance on these claims as their strongest argument in favor of preliminary injunctive relief, the court finds that Plaintiffs are unlikely to succeed on the merits of any claim challenging the deadlines applicable to Utah's initiative process.

The 30-Day Deadline Provision regulates when signed signature packets must be submitted. Utah Code § 20A-7-105(5)(a)(i)(A). This rule is plainly a nondiscriminatory "law that determine[s] the process by which legislation is enacted," which neither regulates who may speak in support of the Initiative nor how they may do so. *Walker*, 450 F.3d at 1099–1100. As a result, the 30-Day Deadline Provision does not implicate the First Amendment. Plaintiffs' claim challenging this provision is therefore not likely to succeed.

In contrast to the 30-Day Deadline Provision, the 316-Day Deadline Provision and February 15 Deadline Provision do implicate the First Amendment. Together, these two provisions define the total period of time in which petition sponsors may gather signatures in support of their

initiative. In the past, however, the Tenth Circuit has analyzed analogous state regulations under a rational basis standard of review, upholding laws more restrictive than those at issue in the present case. In *ACLF*, the Tenth Circuit heard a First Amendment challenge to a Colorado statute that limited the entire signature-gathering process to a single six-month period. 120 F.3d at 1098. Despite the statute's strict limitation on ballot access and the burden imposed on initiative sponsors, the court described the six-month rule as a "neutral ballot access regulation[,]" writing that the mere fact that "ballot access restrictions prevent some measures from being placed on the ballot" is "insufficient by itself to require strict scrutiny." *Id.* "[B]y planning and proper preparation," the court wrote, "title proponents enjoy ample time to circulate petitions." *Id.* at 1099. The court therefore upheld the six-month provision, finding that the state had a rational basis in establishing such a rule to preserve the integrity of elections, maintain an orderly ballot, and limit voter confusion. *Id.*

The 316-Day Deadline Provision and February 15 Deadline Provision together established that Plaintiffs had roughly eight months in which to gather the required number of signatures. *See* ECF No. 1, ¶ 17. Like the provision challenged in *ACLF*, these rules are neutral ballot access regulations. Of course, the provisions offered Plaintiffs a longer period in which to gather signatures than the six-month period upheld in *ACLF*. Plaintiffs offered other reasons why the challenged provisions might demand strict scrutiny, but none of these arguments are persuasive. Plaintiffs claim that the "blackout" period between February 15th and the election, prevents Plaintiffs from gathering signatures and public support for their Initiative in the period leading up to the election date. But the State persuasively noted that Utah voters were significantly engaged with the debate over Utah's state flag when Plaintiffs' launched their initiative campaign following the Utah Legislature's adoption of S.B. 31 in 2023. And Utah law does not prohibit any person

from speaking in support of the Initiative or otherwise advocating for political change with regard to Utah's state flag. Plaintiffs and others are free to do so at any time notwithstanding the February 15 Deadline Provision for signature gathering efforts. The State also produced evidence showing that other initiative efforts met the applicable ballot access requirements while gathering signatures within the same timeframe Plaintiffs were provided. In 2019, for example, the State pointed out that one sponsor of this Initiative sponsored the Referendum on Tax Restructuring Revisions, which gathered more than the required number of petition signatures in a five-week period between December 2019 and January 2020. ECF No. 26-1, ¶ 35. There appears to be no factual basis upon which the court could find that Plaintiffs were inhibited from freely speaking in support of their Initiative and working to qualify for ballot access in the time between June 2023 and February 15, 2024. Plaintiffs' articulated desire to continue gathering signatures when springtime comes to Utah is unavailing. Perhaps some signature gatherers would prefer to gather signatures in May as opposed to December. But the First Amendment has no opinion on Utah's weather patterns.

As the court found in *ACLF*, this court concludes that "title proponents enjoy ample time to circulate petitions" through "planning and proper preparation[.]" *ACLF*, 120 F.3d at 1098–99. As a result, rational basis review is the appropriate standard to apply. And the State has articulated a number of bases upon which it adequately justifies the 316-Day Deadline Provision and the February 15 Deadline Provision. These rules work together to require initiative sponsors to demonstrate "*current* support for the initiative," ensuring order in the administration of the election process and decreasing voter confusion while promoting voter information about the election and issues on the ballot.

As a result of the foregoing, Plaintiff is not likely to succeed on the merits of any of their three claims challenging the deadline provisions applicable to the initiative process.

###### ii.      *Initiative Signature Packet Formatting*

Second, Plaintiffs challenge two statutory provisions regulating the format of initiative signature packets. In *Meyer v. Grant* itself, the Court discussed a law that is very similar to the Misdemeanor Warning Provision at issue here. In *Meyer*, Colorado had required "the petition [to] . . . bear a statement printed in red ink warning potential signatories that it is a felony to forge a signature on a petition or to sign the petition when not qualified to vote[.]" 486 U.S. at 427. The Court merely referred to this law as a reasonable mechanism by which the state could deter fraud; the Court made no indication that a law requiring petition signature packets to bear a warning about fraud or other violations of state law would somehow implicate the First Amendment. *See id.* Particularly because the Court discussed these provisions in the context of a First Amendment challenge to a statute prohibiting any compensation of petition circulators on the basis that such compensation would incentivize fraud in the initiative process, this appears to be highly persuasive authority that regulations merely affecting the formatting of ballot initiative pages fall within the class of laws that simply "determine the *process* by which legislation is enacted[.]" *Walker*, 450 F.3d at 1099–1100. The same is true for the Two Signature Per Page Provision. That law could make the initiative process "more difficult and costly" due to increased printing costs and other expenses, but that fact would not change the conclusion that the law does not implicate the First Amendment. *Semple*, 934 F.3d at 1142. Thus, neither the Two Signatures Per Page Provision nor the Misdemeanor Warning Provision implicates the First Amendment and Plaintiffs are not likely to succeed in challenging either provision on that basis.

###### iii.      *Disclosure of Rejected Signatures*

Finally, Plaintiffs bring First Amendment claims related the Packet Retrieval Provision and the Accepted Signatures Disclosure Provision, which they allege impact their ability to find voters

whose signatures were rejected in order to invite them to sign the Initiative a second time (in violation of Utah Code § 20A-7-213(1)(b)). Neither provision regulates who may speak in support of the Initiative or how they may do so. Instead, these statutes impose nondiscriminatory regulations of the "process by which legislation is enacted" by initiative. *Walker*, 450 F.3d at 1099–1100. The court notes, moreover, that Plaintiffs do not contest the legality of the Accepted Signatures Disclosure Provision; they simply ask the court to write an analogous provision into law requiring the state to also disclosure *rejected* signatures. Plaintiffs provide no basis in law upon which the court could fashion such a remedy out of what Plaintiffs cursorily refer to as a "First Amendment" claim.

For the foregoing reasons, the court concludes that Plaintiffs are unlikely to prevail on the merits any of their remaining claims.

## IV.     PUBLIC INTEREST AND BALANCE OF HARMS

Plaintiffs' claims each lack irreparable harm as well as either justiciability or a likelihood of success on the merits. The court therefore does not reach the final two factors that weigh on Plaintiffs' request for preliminary injunctive relief, having found the previously discussed factors to be dispositive.

## V.     SUPPLEMENTAL JURISDICTION

Plaintiffs request that this court exercise supplemental jurisdiction to adjudicate each of their claims under the Utah Constitution in addition to the First Amendment to the United States Constitution. The court is empowered to decline to exercise its supplemental jurisdiction, however, in cases involving a "novel or complex issue of State law," or where "there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). Both factors apply here. First, no court has adjudicated the validity of these statutory provisions under the Utah Constitution, and this

court finds no cases in which similar provisions have been challenged under state law. Whether the challenged statutory provisions violate the Utah Constitution raises a number of novel questions regarding the bounds of Utah citizens' right to enact legislation by initiative. Moreover, Plaintiffs make only cursory mention of the Utah Constitution in their motion, providing the court practically no briefing upon which to adjudicate novel questions of state law. The court therefore declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

**ORDER**

For the reasons stated herein, Plaintiffs' Motion for Expedited Preliminary Injunction (ECF No. 2) is **DENIED**.

Signed March 11, 2024

BY THE COURT

Jill N. Parrish
United States District Court Judge